Brent Carrier
Plaintiff in Pro Se
45 Carleon Avenue
Larchmont, New York 10538
(917) 847-9876

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VERNON 4540 REALTY LLC,<br><br>          Debtor. | Chapter 11<br><br>Case No. 20-22919 (RDD) |
| BRENT CARRIER<br><br>          Plaintiffs,<br>v.<br><br>CSC 4540, LLC, 45-50 VERNON LP,<br>JSMB 4540 LLC, JSMB 4540 MM LLC, and<br><br>VERNON 4540 REALTY LLC<br><br>          Defendants. | Adversary Proceeding<br><br>Case No. |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff Brent Carrier ("LLC Member"), submits this Complaint for declaratory relief and damages concerning Brownfield Tax Credits ("BTC") earned through Debtors satisfactory environmental remediation of Site No.: C241108 under the Amended Brownfield Cleanup Agreement ("BCA") executed by Debtor on August 2, 2011, derived from New York State's Brownfield Cleanup Program

1

("BCP") pursuant to Article 27, Title 14 of the New York State Environmental Conservation Law ("ECL"), and 100% allocated to LLC Member by Debtor.

LLC Member begs this Court recognize and confirm Debtor's contractual allocation of BTC and resultant tax refunds to LLC Member in a manner consistent with this Court's prior recognition of Defendant CSC 4540 LLC's allocation of qualifying BTC expenditures and related BTCs to its members (Exhibit 1), as Defendants accomplished before this Court. In support of his Complaint, Plaintiff respectfully states and alleges as follows:

## NATURE OF THE ACTION

1.    On November 14, 2013 ("BTC Allocation Date"), Debtor and its members Amended the July 21, 2011 Operating Agreement of Vernon 4540 Realty LLC ("Debtor LLC Agreement"), allocating 100% of all NYS DEC Brownfield Tax Credits related to Brownfield Cleanup Site C241108 to LLC Member (Exhibit 2)

2.    On November 15, 2013, the parties, recognizing Defendant CSC 4540 LLC's Class-A member/partner Manresa Limited (Defendant 45-50 Vernon LP's purported successor in interest) as a Cayman Islands limited company ineligible to receive any NYS BTC tax refund(s) due to its foreign US and NYS non-tax paying status, contractually agreed to allocate 50-50 between the Class A and Class B members, Defendant CSC 4540 LLC's "expenditures qualifying" for BTC, treating related BTC as a capital account adjustment in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii) (Exhibit 1, Section 8.2)

3.     On December 15, 2016, NYS Department of Environmental Conservation ("DEC") recognized Debtors successful environmental remediation of site C241108 as a Volunteer in the BCP, in compliance with ECL, publishing its Fact Sheet and issued its Certificate of Completion with confirmation of Debtors successful performance under its August 4, 2011 Brownfield Cleanup Agreement (Exhibit 3)

4.     On August 5, 2020 (the "Petition Date"), the Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code in response to the staggering costs of litigating Defendants CSC 4540 LLC, 45-50 Vernon LP, JSMB 4540 LLC and JSMB 4540 MM LLC ("Quadrum Defendants") malicious prosecution (Exhibit 4), and to seek a stay of the parties AAA Case 01-17-0003-2604 ("Arbitration") wherein Quadrum Defendants seek to strip Debtor, and by direct result LLC Member, of its right to partnership distributions, while further pursuing a conversion of the Debtor's Estate to the sole benefit of Defendants 45-50 Vernon ("Quadrum") and JSMB 4540 LLC (SimonBaron", collectively "Class-A Managing Member").

5.     On November 9, 2020, Quadrum Defendants filed a Complaint (AP 20-07020-rdd Docket No. 1) against Defendant Debtor and Plaintiff LLC Member, seeking the turnover of LLC Member's personal 2016 joint NYS Tax Refund related to certain BTC specifically defined as derived from the LLC Agreement Section 8.2(b), in the amount of at least $1.9 million and as much as $2.5 million

6. On April 28, 2021, a Hearing (AP 20-07020-rdd Docket No. 81) was held to consider Quadrum Defendant's Motion for Contempt (AP 20-07020-rdd Docket No. 69) as well as LLC Member's Motion to Reconsider (AP 20-07020-rdd Docket No. 64) and separate Motion to Vacate, Set-Aside, Alter or Amend (AP 20-07020-rdd Docket No. 62) this Courts March 29, 2021 Order Granting Summary Judgment (AP 20-07020-rdd Docket No. 60). In its bench ruling therein this Court declared Debtor's allocation of BTC from Defendant CSC 4540 LLC under Section 8.2 of the LLC Agreement as valid but noted that it had not yet determined or ruled on the matter of Debtor's allocation of its BTC to LLC Member.

APRIL 28, 2021 TRANSCRIPT OF PROCEEDINGS (AP 20-07020-rdd DOCKET NO. 81)

    i. Pg.5, line 18-19: "…that issue, I think, is not determined by the March 29 Order."

    ii. Pg.6, line 22-23: "The Order does not make that determination."

    iii. Pg.7, line 5-6: "The Order simply doesn't say any of that. All right?"

    iv. Pg.7, line 12-23: Issue raised regarding Debtors BTC allocation to its member being treated differently than CSC's BTC allocation to its member(s).

    v. Pg.7, line 24-25: "I haven't decided the earlier set of facts."

    vi. Pg.16, line 7-12: Issue raised that the Examiner is to have powers to determine Debtor's interest in the BTC

vii. Pg.16, line 18-23: Issue raised relates to the Examiner determining Debtors on the BTC

viii. Pg.17, line 13-16: Examiner is independent and not to take direction from Plaintiffs

7.      NYS DTF issued an Advisory Opinion ("TSB-A-09(7)C") on May 13, 2009 concluding that BTC tax credits may be allocated among a certificate of completion holders members if the holder is a party to a Brownfield Site Cleanup Agreement. (Exhibit 5)

8.      Debtor is a Limited Liability Company which elected to be treated as a pass-through entity for tax purposes at its inception in 2011.

9.      Debtor contractually allocated its Brownfield Tax Credits and resultant tax refunds to some, but not all, of its members under the Debtors Operating Agreement of Vernon 4540 Realty LLC ("Debtor LLC Agreement")

10.     Defendant CSC 4540 LLC is a Limited Liability Company which elected to be treated as a pass-through entity for tax purposes at its inception in 2013.

11.     Defendant CSC 4540 LLC contractually allocated its expenditures qualifying for Brownfield Tax Credits to some, but not all, of its members under CSC 4540 LLC's LLC Agreement, Section 8.2(b) Other Allocation rules.

12.     LLC Member has filed five separate IT-201 NYS tax returns for each of the years 2016-2020, including appropriate forms IT-613 and/or IT-611.1, under which LLC Member and his spouse sought personal joint NYS tax refunds totaling

$12,6143,833. To date, only the 2017 IT-213 with form IT-611.1 tax filing was approved and paid in full by the NYS Department of Tax & Finance ("NYS DTF").

13. The forthcoming proceeds of LLC Members 50% share of his joint NYS tax refunds constitute significant assets and are expected to be a valuable asset for LLC Member's purpose of the formulation and implementation of a plan of reorganization for the Debtor.

14. In Adversary Proceeding Case No. 20-07020, Quadrum Defendants seek to convert LLC Members personal assets to the Debtors Estate, while simultaneously proposing a plan of liquidation for Debtor without consideration of (i) Debtors claims against Defendant CSC 4540 LLC and its Class-A Managing Member(s) or (ii) Debtors interests in the forthcoming tangible tax credit component attributable to the BTC, valued up to $45 million, and under the pretext of Proof of Claims not filed in good faith by Quadrum Defendants. In fact, Defendant JSMB 4540 MM LLC has purportedly already withdrawn its unsupportable claim, and Defendant JSMB 4540 LLC has effectively done so as well by issuing a 77% reduction of its claim; though ignoring that its claim for the remaining 23% is contractually limited to a 7% interest in such reduced claim.

15. LLC Member brings this Complaint for Declaratory Relief to give all parties clarity about the scope of the NYS Brownfield Cleanup Program's BTC, the statutory NYS Environmental Conservation Laws, NYS DTF Internal Revenue Code Article 9-A regulations, and the availability and amount of proceeds potentially available to enable the parties in interest to advance ongoing

negotiations regarding the structure and terms of a confirmable plan of reorganization for the Debtor.

16.     LLC Member received the allocation of Debtors beneficial interest to NYS BTC on November 14, 2013, pre-Petition, in a manner consistent with the allocation of qualifying expenditures for BTC that CSC 4540 LLC distributed to its members, and seeks herein a determination of LLC Member's sole rights to BTC Tax Credits and resultant tax refunds, as contractually allocated to him by Debtor, consistent with the Courts prior ruling for allocation of BTC by Defendant CSC 4540 LLC.

## COUNT ONE: DECLARATORY JUDGMENT (ALL DEFENDANTS)

14.     LLC Member incorporates the foregoing paragraphs as if fully set forth herein.

15.     Defendants CSC 4540 LLC, 45-50 Vernon LP, JSMB 4540 LLC and JSMB 4540 MM LLC have disputed, declined or failed to perform their fiduciary duties and obligations set forth in the LLC Agreement, and as Ordered by the Hon. Judge Barbara Jaffe (Exhibit 6) to correct the tax filings and capital accounts of CSC 4540 LLC to Debtors Legal Satisfaction; duties also owed to Debtor and its members under NYS Partnership Law; and upon information and belief, will dispute, decline or fail to perform fully these obligations (Exhibit 6 – 2019 "mistaken" CSC 4540 LLC partnership tax filings)

16.     Declaratory relief regarding the Defendant Class-A Managing Member(s) improper submittal of partially duplicative NYS IT-611.1 remediation

component tax credit claims without benefit of being a party to a Brownfield Cleanup Agreement. The value of LLC Members tax refund is severely impaired and jeopardized by Defendant Class-A Managing Member(s) improper BTC claim.

17.     LLC Member asserts and seeks a declaratory judgment that each of the Quadrum Defendants and the members of Defendants 45-50 Vernon LP and JSMB 4540 LLC are obligated to withdraw their claims to 2016-2020 NYS BTC remediation tax refund claims attributable to any such filing not supported by a valid Brownfield Cleanup Agreement, as required under ECL.

18.     The requested declaratory relief will terminate some or all of the controversary between the parties, and significantly reduce the burden of future litigation actions before this Court.

## PRAYER FOR RELIEF

WHEREFORE, LLC Member requests that the Court enter judgment against the Defendants as follows:

a.  Declaring the rights of LLC Member to receive and retain its 100% allocation of BTC from Debtor.

b.  Awarding money damages that have accrued as of the time of trial as a result of the Court's declaration of LLC Members entitlement to BTC and resultant tax refund(s) allocated to LLC Member with respect to Brownfield Cleanup Site No.: C241108.

c.  Awarding costs of suit;

d. Awarding Debtor costs and expenses of Examiner and Examiner Counsel, to be paid by Class-A Managing Member(s);

e. Awarding prejudgment interest;

f. Awarding post-judgment interest; and

g. Providing such other and further relief to which the Court may deem LLC Member and Debtor to be justly entitled.


Dated:      Larchmont, New York
              July 27, 2021

Brent Carrier
Plaintiff in Pro Se
45 Carleon Avenue
Larchmont, NY 10538

# EXHIBIT 1

LIMITED LIABILITY COMPANY AGREEMENT

of

CSC 4540, LLC

by and among

MANRESA LIMITED

JSMB 4540 LLC

JSMB 4540 MM LLC

and

VERNON 4540 REALTY, LLC

DATED AS OF NOVEMBER 15, 2013

PURCHASERS OF LIMITED LIABILITY COMPANY UNITS ("*UNITS*") IN CSC 4540, LLC WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENTS FOR AN INDEFINITE PERIOD OF TIME. THE UNITS HAVE NOT BEEN REGISTERED (I) UNDER ANY STATE SECURITIES LAW (A "*STATE ACT*"), OR (II) UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "*FEDERAL ACT*"). THE UNITS MAY NOT BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED EXCEPT (1) IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF ARTICLE 13 OF THIS AGREEMENT, WHICH RESTRICTS THE TRANSFER OF UNITS, (2) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER EACH APPLICABLE STATE ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER SUCH STATE ACT OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED, AND (3) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE FEDERAL ACT OR IN A TRANSACTION WHICH IS EXEMPT FROM REGISTRATION UNDER THE FEDERAL ACT OR FOR WHICH SUCH REGISTRATION OTHERWISE IS NOT REQUIRED.

# TABLE OF CONTENTS

Page

ARTICLE 1     DEFINED TERMS ........................................................................... 1

Section 1.1     Definitions ........................................................................ 1
Section 1.2     Rules of Construction ........................................................ 19

ARTICLE 2     FORMATION AND TERM ............................................................ 20

Section 2.1     Organization ..................................................................... 20
Section 2.2     Name ................................................................................ 20
Section 2.3     Members; Classes of Members; Member Units ............... 20
Section 2.4     Term ................................................................................. 21
Section 2.5     Registered Office ............................................................. 21
Section 2.6     Principal Place of Business .............................................. 21
Section 2.7     Qualification in Other Jurisdictions ................................ 22
Section 2.8     Tax Status ........................................................................ 22
Section 2.9     Ownership ........................................................................ 22

ARTICLE 3     PURPOSE AND POWERS OF THE COMPANY ........................ 22

Section 3.1     Purpose ............................................................................ 22
Section 3.2     Powers of the Company ................................................... 22

ARTICLE 4     CAPITAL CONTRIBUTIONS, UNITS, CAPITAL ACCOUNTS AND ADVANCES ................................................................................ 24

Section 4.1     Capital Contributions ...................................................... 24
Section 4.2     Units ................................................................................ 24
Section 4.3     Status of Capital Contributions ....................................... 25
Section 4.4     Capital Accounts ............................................................. 25
Section 4.5     Prohibition Against Withdrawals ..................................... 26
Section 4.6     Capital Calls .................................................................... 26
Section 4.7     Additional Advances ....................................................... 27
Section 4.8     Excess Advance ............................................................... 28
Section 4.9     Unpaid Excess ................................................................. 29
Section 4.10     Additional Members and Units ........................................ 29
Section 4.11     Certain Agreements Regarding Guaranties; Contribution Agreement ....................................................................... 30

ARTICLE 5     MEMBERS .................................................................................... 30

Section 5.1     Powers of Members ......................................................... 30
Section 5.2     Covenants of Members .................................................... 30
Section 5.3     Meetings of the Members ................................................ 31
Section 5.4     Limitation of Liability ..................................................... 32
Section 5.5     Authority ......................................................................... 32
Section 5.6     Partition ........................................................................... 32
Section 5.7     Resignation of Members .................................................. 32
Section 5.8     Conflicting Interest ......................................................... 33
Section 5.9     Conflicting Interest ROFO .............................................. 33
Section 5.10     Amendments .................................................................... 34

|  |  | Page |
|---|---|---|
| ARTICLE 6 | MANAGEMENT AND CONTROL OF COMPANY | 34 |
| Section 6.1 | Appointment of Board of Directors; Meetings | 34 |
| Section 6.2 | Operating Member | 36 |
| Section 6.3 | Officers | 38 |
| Section 6.4 | Approval Requirements | 39 |
| Section 6.5 | Special Duties of the Board | 39 |
| Section 6.6 | Director Compensation | 39 |
| Section 6.7 | Development Management Agreement; Property Management Agreement; Entitlements Agreement; Member Fees | 39 |
| Section 6.8 | Company Expenses | 40 |
| Section 6.9 | Offices | 40 |
| Section 6.10 | Brownfield Tax Credits | 40 |
| ARTICLE 7 | DEADLOCK; DISPUTE RESOLUTION | 41 |
| Section 7.1 | Deadlock | 41 |
| Section 7.2 | Dispute Resolution | 41 |
| ARTICLE 8 | ALLOCATIONS | 42 |
| Section 8.1 | Allocations | 42 |
| Section 8.2 | Other Allocation Rules | 42 |
| ARTICLE 9 | DISTRIBUTIONS | 43 |
| Section 9.1 | Distributions | 43 |
| Section 9.2 | Mandatory Distributions | 44 |
| Section 9.3 | Amounts Withheld | 45 |
| Section 9.4 | Distribution To Transferor and Transferee | 45 |
| Section 9.5 | In Kind Distributions | 46 |
| Section 9.6 | Limitation Upon Distribution | 46 |
| ARTICLE 10 | BOOKS AND RECORDS; ACCOUNTING; BUSINESS PLAN | 46 |
| Section 10.1 | Books, Records and Financial Statements | 46 |
| Section 10.2 | Accounting Method | 46 |
| Section 10.3 | Bank Accounts | 46 |
| Section 10.4 | Annual Plan | 47 |
| Section 10.5 | Reports | 47 |
| ARTICLE 11 | TAX MATTERS | 48 |
| Section 11.1 | Tax Matters Member | 48 |
| Section 11.2 | Right to Make Tax Elections | 48 |
| Section 11.3 | Reports | 48 |
| Section 11.4 | Tax Status | 49 |
| ARTICLE 12 | LIABILITY, EXCULPATION AND INDEMNIFICATION | 49 |
| Section 12.1 | Liability | 49 |
| Section 12.2 | Exculpation | 49 |
| Section 12.3 | Duties of Covered Persons | 50 |
| Section 12.4 | Indemnification | 50 |
| Section 12.5 | Expenses | 50 |

ARTICLE 13     ASSIGNABILITY AND NEW MEMBERS ............................................. 51

    Section 13.1     Restrictions on Transfer ........................................................... 51
    Section 13.2     Permitted Transfers .................................................................. 51
    Section 13.3     Prohibited Transfers ................................................................. 52
    Section 13.4     Economic Interest Owner ......................................................... 52
    Section 13.5     Admission of Members ............................................................. 52
    Section 13.6     Effective Date of Assignment .................................................. 53
    Section 13.7     Right of First Offer .................................................................. 53
    Section 13.8     Tag-Along Rights ...................................................................... 54
    Section 13.9     Drag-Along Rights .................................................................... 55
    Section 13.10     Termination of Obligations ...................................................... 55
    Section 13.11     CRE Sale Option ....................................................................... 55

ARTICLE 14     DISSOLUTION, LIQUIDATION AND TERMINATION ...................... 58

    Section 14.1     No Dissolution .......................................................................... 58
    Section 14.2     Events Causing Dissolution ...................................................... 58
    Section 14.3     Withdrawing Member ............................................................... 58
    Section 14.4     Timing and Effect of Dissolution ............................................ 58
    Section 14.5     Liquidation Procedures ............................................................. 59
    Section 14.6     Termination ............................................................................... 59
    Section 14.7     Claims of the Members ............................................................. 59
    Section 14.8     No Liability for Capital Contributions .................................... 59

ARTICLE 15     BUY/SELL OPTION ............................................................................. 60

ARTICLE 16     MISCELLANEOUS ............................................................................. 63

    Section 16.1     Notices ....................................................................................... 63
    Section 16.2     Right to Defer Closing .............................................................. 64
    Section 16.3     Failure to Pursue Remedies ...................................................... 65
    Section 16.4     Cumulative Remedies ............................................................... 65
    Section 16.5     Binding Effect ........................................................................... 65
    Section 16.6     Benefits of Agreement; No Third-Party Rights ...................... 65
    Section 16.7     Severability ............................................................................... 65
    Section 16.8     Counterparts .............................................................................. 65
    Section 16.9     Integration ................................................................................. 65
    Section 16.10     Governing Law ......................................................................... 66
    Section 16.11     Jurisdiction; Venue ................................................................... 66
    Section 16.12     Waiver of Jury Trial ................................................................. 66
    Section 16.13     Attorneys' Fees ......................................................................... 66
    Section 16.14     Confidentiality .......................................................................... 66

| | |
|---|---|
| SCHEDULE A | CAPITAL CONTRIBUTIONS |
| EXHIBIT B | APPROVAL REQUIREMENTS |
| EXHIBIT C | DISTRIBUTION PRIORITY |
| EXHIBIT D | MEMBER FEES |
| EXHIBIT E | REQUIRED INTEREST RATE AND CONVERSION FACTOR SCHEDULE |
| EXHIBIT F | EXAMPLE OF CONVERSION CALCULATION |
| EXHIBIT G | DEVELOPMENT BUDGET |
| EXHIBIT H | DEVELOPMENT MANAGEMENT AGREEMENT |
| EXHIBIT I | PROPERTY MANAGEMENT AGREEMENT |
| EXHIBIT J | ENTITLEMENTS SERVICES AGREEMENTS |
| EXHIBIT K | CAPITAL CONTRIBUTION AGREEMENT |
| EXHIBIT L | CRE RESTRICTED AREA |
| EXHIBIT M | FORM OF ASSIGNMENT OF MEMBERSHIP INTEREST |

LIMITED LIABILITY COMPANY AGREEMENT
OF
CSC 4540, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT OF CSC 4540, LLC (the "*Agreement*") is executed and delivered as of November 15, 2013 (the "*Effective Date*"), by and among MANRESA LIMITED, a Cayman Islands limited company ("*Manresa*" or a "*Member*" or, in its capacity as a Class A Member, a "*Class A Member*"), JSMB 4540 LLC, a New York limited liability company ("*JSMB*" or a "*Member*" or, in its capacity as a Class A Member, a "*Class A Member*"), JSMB 4540 MM LLC, a New York limited liability company ("*JSMB Promote Member*" or, in its capacity as a Class C Member, a "*Class C Member*"), and VERNON 4540 REALTY, LLC, a Delaware limited liability company ("*CRE*" or a "*Member*" or, in its capacity as a Class B Member, a "*Class B Member*" ), as the sole Members.

Recitals

The Members desire to establish CSC 4540, LLC (the "*Company*") as a limited liability company under the New York Limited Liability Company Law, N.Y. Ltd. Liab. Co. Law §101, et seq., as amended from time to time, and any successor thereto (the "*Act*") by entering into this Agreement. This Agreement, together with other related agreements, will memorialize the manner in which the parties may participate together in a multi-family residential rental apartment building project with a retail component. The Company may participate in the project on its own behalf or as an owner (or partial owner) of one or more other entities or subsidiaries.

Agreements

NOW THEREFOR, in consideration of the foregoing recitals and the agreements and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

ARTICLE 1
DEFINED TERMS

Section 1.1    Definitions.  Unless the context otherwise requires, the terms defined in this Article 1 shall, for the purposes of this Agreement, have the meanings herein specified.

"*Act*" has the meaning given it in the Recitals.

"*Additional Advance*" has the meaning set forth in Section 4.7(b).

"*Affiliate*" means with respect to a specified Person, any Person that directly or indirectly controls, is controlled by, or is under common control with, the specified Person.

"*Agreement*" means this Limited Liability Company Agreement, as amended, modified, supplemented or restated from time to time.

"*Annual Budget*" means, for each year after the Substantial Completion Date, the estimated capital and operating budgets for the Company for such year approved as part of the Annual Plan.

"*Annual Plan*" means, for each year after the Substantial Completion date, the annual business plan for the Company, including the Annual Budget, which shall guide the operation of the business of the Company during the course of such year. The Annual Plan may be based upon the annual plans and budgets prepared by the Property Manager under the Property Management Agreement.

"*Applicable CRE Percentage*" means, as of the date of any distribution of Net Cash Flow or Capital Transaction Proceeds, (i) prior to completion of the foundation for the Building, 30 Percent, (ii) after completion of the foundation for the Building but prior to topping out of the Building, 22.33 percent, (iii) after topping out of the Building but prior to enclosure of the Building, 14.66 percent, and (iv) after enclosure of the Building, seven percent, in each case as determined by the Project's architect.

"*Applicable Interest Rate*" means the lesser of (A) the Required Interest Rate and (B) the maximum rate permitted by applicable law.

"*Articles*" means the Articles of Organization and any and all amendments thereto and restatements thereof filed on behalf of the Company with the office of the Secretary of State of the State of New York pursuant to the Act.

"*As of Right*" means, with respect to a real estate development or construction project, that the construction or development in question does not require any discretionary zoning, use, or development approvals (such as a special permit, variance, or waiver).

"*Bankruptcy*" has the meaning given it in Section 102 of the Act.

"*Board*" shall have the meaning set forth in Section 6.1.

"*Bona Fide Purchaser*" means any Person that has delivered a good faith written offer to purchase for cash or cash equivalents all or any portion of a Member's interest in the Company, or an ownership interest in such Member (to the extent that it pertains to the Member's interest in the Company), except that the term "*Bona Fide Purchaser*" shall not include (i) another Member, (ii) any Affiliate of any Member, or (iii) any Affiliate or Immediate Family Member of any direct or indirect beneficial owner of any Member.

"*Brownfield Cleanup Agreement*" means the agreement pursuant to which the remediation of the Site will be undertaken in pursuant to the Brownfield Cleanup Program.

"*Brownfield Cleanup Program*" means the environmental cleanup program of that name established under Title 14 of Article 27 of New York's Environmental Conservation Law.

"*Brownfield Tax Credits*" means the New York State tax credits under Section 21 of the Tax Law of the State of New York, which are associated with the Brownfield Cleanup Program.

"*Budget Impact Event*" means any of the following events to the extent such event would increase an amount set forth in the Development Budget (by line item or other narrower categorization providing for the same) for payment of a particular item: (i) a force majeure event that occurs after the Development Budget was approved, (ii) changes in applicable law after the Development Budget was approved, or (iii) increases in commodity prices that occur between the date hereof and the execution of a contract with the general contractor for the Project that establishes a guaranteed maximum price for the construction work for the Project.

"*Building*" means the multi-family rental apartment building, including a retail component, to be developed at the Site.

"*Business Day*" means any day on which banks are open for business in New York, New York.

"*Buy-Sell Deposit*" means an amount equal to ten percent of the Buy-Sell Price that is set forth in the Buy-Sell Notice for the Sale Interest of the Initiating Member.

"*Buy-Sell Election Notice*" has the meaning given it in Article 15.

"*Buy-Sell Election Period*" has the meaning given it in Article 15.

"*Buy-Sell Event*" means the occurrence of (i) a Deadlock with respect to a decision set forth on **Exhibit B** of this Agreement and the failure of the parties to resolve the Deadlock through agreement or mediation as set forth in Article 7 or (ii) a material breach of a Member Agreement by a party as a result of its non-performance, willful default, fraud or gross negligence, which breach cannot be cured or is the result of fraud or willful default or, in the case of a breach that can be cured, the defaulting Party has failed to remedy (A) within the notice and cure period for such breach or default set forth in the applicable Member Agreement, or (B) if there is no such cure period specified, within 30 days after receiving notice in writing from the other Party specifying the breach and requiring its remedy.

"*Buy-Sell Notice*" has the meaning given it in Article 15.

"*Buy-Sell Option*" has the meaning given it in Article 15.

"*Buy-Sell Price*" has the meaning given it in Article 15.

"*Capital*" means, as of the date of calculation, (i) in the case of Manresa or JSMB, the total amount of Capital Contributions it has theretofore contributed, and (ii) in the case of CRE, the CRE Deemed Capital Contribution.

"*Capital Account*" means, with respect to any Member or Economic Interest Owner, the account maintained for such Member or Economic Interest Owner in accordance with the provisions of Section 4.4 hereof.

"*Capital Call*" has the meaning set forth in Section 4.6.

"*Capital Commitment*" means, with respect to each Member, (i) the aggregate amount of cash or property that each such Member has agreed to contribute to the capital of the Company as specified on Schedule A, as such schedule may be amended from time to time, and (ii) its share of any Class A Member Budget Commitment.

"*Capital Contribution*" means, with respect to any Member, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company pursuant to Sections 4.1 or 4.6(a) or (d) hereof and the amount of any Unpaid Excess that is converted to a Capital Contribution in accordance with Section 4.9. In the case of a Member or Economic Interest Owner who acquires an interest in the Company by virtue of an assignment in accordance with the terms of this Agreement, "Capital Contribution" has the meaning set forth in Section 4.4(a) hereof.

"*Capital Contribution Agreement*" means that certain Capital Contribution Agreement of even date herewith, substantially in the form attached hereto as Exhibit K, among the Members holding Capital Units that sets forth the aggregate amount of money and/or other property, and the initial Gross Asset Value of any property (other than money) to be contributed to the Company as of the Contribution Date.

"*Capital Transaction*" means (i) a sale, exchange, or other disposition of any property by the Company for value, other than in the ordinary course of business, including an involuntary conversion by condemnation, casualty or otherwise, on which gain or loss is recognized by the Members for federal income tax purposes, or (ii) a refinancing of any mortgage indebtedness of the Company secured by all or substantially all of the Company's assets.

"*Capital Transaction Proceeds*" means all cash received by the Company from a Capital Transaction, less the sum of the following for which Capital Transaction Proceeds are used by the Company, (i) all expenses paid or incurred in connection with such Capital Transaction, (ii) amounts received from a Capital Transaction applied to repayment of indebtedness (including any Member Loans, Excess Advance, or Excess Capital), (iii) capital expenditures made from the proceeds of such Capital Transaction, and (iv) such additions to reserves for capital expenditures, liabilities or obligations of the Company or other purposes as the Board may determine to be necessary. All amounts released from time to time from such reserves other than for application to the purpose for which the reserve was established or for reallocation to another reserve shall be deemed to be Capital Transaction Proceeds.

"*Capital Units*" has the meaning set forth in Section 2.3.

"*Certificate of Occupancy*" shall mean a permanent or temporary certificate of occupancy, in either case, for the portion of the Project specified in such certificate of occupancy issued by the applicable governmental authority pursuant to applicable law, which permanent and temporary certificate of occupancy shall permit such portion of the Project covered thereby to be lawfully occupied and used for its intended purposes substantially in accordance with the Development Plan, shall be in full force and effect and, in the case of a temporary certificate of occupancy, shall permit full use and lawful occupancy of the portion(s) of the Project covered thereby, and if such temporary certificate of occupancy shall provide for an expiration date, any

Punch List Items which must be completed in order for such temporary certificate of occupancy to be renewed or extended shall be completed prior to the applicable expiration date thereof.

"*Change Order*" has the meaning given it in the Development Management Agreement.

"*Class A Member*" or "*Class A Members*" means any Person named as a Class A Member of the Company on Schedule A attached hereto and includes any Person subsequently admitted as a Class A Member.

"*Class A Member Budget Commitment*" means the amount, if any, that a Class A Member has committed to fund as set forth in the line item with that name in the Development Budget or the applicable Annual Budget.

"*Class B Member*" or "*Class B Members*" means any Person named as a Class B Member of the Company on Schedule A attached hereto and includes any Person subsequently admitted as a Class B Member.

"*Class C Member*" or "*Class C Members*" means any Person named as a Class C Member of the Company on Schedule A attached hereto and includes any Person subsequently admitted as a Class C Member.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding federal tax statute enacted after the date of this Agreement. A reference to a specific section of the Code refers not only to such specific section but also to any corresponding provision of any federal tax statute enacted after the date of this Agreement, as such specific section or corresponding provision is in effect on the date of application of the provisions of this Agreement containing such reference.

"*Co-Development Manager*" means the Cube Co-Development Manager and/or the CRE Co-Development Manager as the context requires.

"*Company*" means CSC 4540, LLC, the limited liability company formed under and pursuant to the Act and this Agreement.

"*Conflicting Interest*" means any actual ownership or management interest, or any consulting or service relationship, of (i) JSMB and/or any of its Affiliates, (ii) CRE and/or any of its Affiliates, or (iii) Manresa and/or any of its Affiliates (other than Cube Capital LLP or any of its Affiliates), in or with any residential rental apartment building ownership or development in Long Island City, New York, whether engaged in independently or with others, except that in any case a "*Conflicting Interest*" shall not include (A) ownership or development of any residential rental apartment building or development (x) as a passive investor, (y) in which another Member is also a direct or indirect owner, or (z) existing on the date hereof, or (B) any consulting or service relationship CRE and/or any of its Affiliates may have with respect to Lot 10 so long as, prior to the Entitlements Date, it does not involve any actual or imputed direct or indirect ownership, management, profit, contingent interest, shadow equity or similar interest.

"*Conflicting Interest Deal Terms*" has the meaning given it in Section 5.9.

"*Construction Cost Overrun*" means any cost to complete the Project in accordance with the Development Plan that either (i) exceeds the amount set forth for payment of the same (by line item or other narrower categorization providing for the same) in accordance with the Development Budget (as amended from time to time) and (ii) has not been approved by Manresa in writing.

"*Construction Loan*" means the loan obtained by the Company for the purpose of the acquisition, construction, and/or development of the Project.

"*Contingent Purchase Price*" has the meaning given it in the Capital Contribution Agreement.

"*Contribution Date*" means the date the Initial Capital Contributions are delivered to or at the direction of the Company in accordance with the Contribution Escrow.

"*Contribution Escrow*" means the closing escrow established under the Capital Contribution Agreement.

"*Control*," "*controlled*" or "*controlling*" or words or phrases of similar import means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"*Conversion Deadline*" has the meaning given it in Section 4.9.

"*Conversion Factor*" means the applicable conversion factor set forth in the Required Interest Rate and Conversion Factor Schedule attached hereto as <u>Exhibit E</u> based upon the nature of the funded amount and the identity of the funding party. By way of example, based upon the Required Interest Rate and Conversion Factor Schedule, in any case where the Member Advance Share or Unpaid Excess being converted by Manresa relates to amounts funded by it for an Operating Shortfall, the Conversion Factor is 1.5.

"*Covered Person*" means a Member, Operating Member, Director, any Affiliate of a Member or Operating Member or any officers, directors, shareholders, members, partners, employees, representatives or agents of a Member or Operating Member, and their respective Affiliates, and any officer, employee or agent of the Company or its Affiliates.

"*CRE*" has the meaning given it in the Preamble.

"*CRE Control*" means that the control of CRE or the applicable Affiliate of CRE remains in the same group as it exists as of the Effective Date.

"*CRE Deemed Capital Contribution*" means (i) prior to the Entitlements Date, $5,500,000, and (ii) after the Entitlements Date, $6,000,000.

"*CRE Deemed Sale Amount*" means, as of the date of calculation, the amount that would be distributed to CRE pursuant to Article 9 (including <u>Exhibit C</u>) if the Property was sold for an amount equal to the CRE Sale Option FMV, subject to standard prorations.

"*CRE Co-Development Manager*" means CRE or an Affiliate of CRE.

"*CRE Restricted Area*" means the area identified as such on <u>Exhibit L</u> attached hereto.

"*CRE Sale Option*" has the meaning set forth in Section 13.11.

"*CRE Sale Option Exercise Period*" has the meaning set forth in Section 13.11.

"*CRE Sale Option FMV*" means the FMV of the Property determined in accordance with Section 13.11.

"*CRE Sale Option Price*" means (i) prior to the CRE Sale Option Trigger Date, the product of (A) the percentage of Class B Units that are being sold by CRE pursuant to the CRE Sale Option, times (B) the CRE Deemed Capital Contribution, and (ii) after the CRE Sale Option Trigger Date, the product of (A) the percentage of Class B Units that are being sold by CRE pursuant to the CRE Sale Option, times (B) the CRE Deemed Sale Amount.

"*CRE Sale Option Trigger Date*" means the first day of the first calendar month following the calendar month in which the Property has achieved an average of 85 percent occupancy (*i.e.*, tenants in possession and paying rent) for 12 consecutive calendar months.

"*Cube Co-Development Manager*" means Quadrum Development Corp., a Florida corporation and an Affiliate of Manresa.

"*Deadlock*" has the meaning given it in Section 7.1.

"*Deadlock Notice*" has the meaning given it in Section 7.1.

"*Defaulting Member*" has the meaning set forth in Section 4.6.

"*Deferred Closing*" has the meaning set forth in Section 16.2.

"*Depreciation*" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such Fiscal Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"*Development Budget*" means the development budget that is set forth on <u>Exhibit G</u> attached hereto, as the same may be amended from time to time in accordance with this Agreement or the Development Management Agreement.

"*Development Management Agreement*" means (i) that certain DEVELOPMENT MANAGEMENT AGREEMENT to be entered into between the Company (or a Property Co) and Development Manager regarding the development of the Building, in substantially the form set forth on Exhibit H, or (ii) in the event Development Manager is no longer the development manager of the Building, such other agreement to manage the development of the Building as may be entered into by the Company from time to time in accordance with this Agreement.

"*Development Manager*" means JSMB 4540 MM LLC, a New York limited liability company, the Development Manager under the Development Management Agreement.

"*Development Plan*" means the development plan for the acquisition, construction and development of the Project, as the same may be amended from time to time in accordance with this Agreement.

"*Director*" means any Person appointed to be a Director by Manresa or JSMB.

"*Disputed Matter*" has the meaning given it in Section 7.1.

"*Economic Interest*" means a Member's or Economic Interest Owner's share of the Company's Profits, Losses and distributions pursuant to this Agreement and the Act, but shall not include any right to information, to an accounting of the affairs of the Company, to inspect the books or records of the Company, or to vote on, consent to or otherwise participate in any decision of the Members.

"*Economic Interest Owner*" means any Person who is an assignee of a Member's interest in the Company, or part thereof, who does not become a Member pursuant to Article 13.

"*Effective Date*" means the date first set forth in the preamble of this Agreement.

"*Entitled Conflicting Interest*" means any Conflicting Interest that is either As-of Right or does not require any further permits, zoning changes or variances or other governmental approvals in order to proceed with the proposed project or use that makes it a Conflicting Interest.

"*Entitlements*" means the permits, zoning changes or variances or other governmental approvals (the nature of which shall be reasonably acceptable to the Board) that permit the Site to be developed for multi-family residential use.

"*Entitlements Agreement*" means (i) that certain ENTITLEMENT SERVICES AGREEMENT to be entered into between the Company (or a Property Co) and CRE or an Affiliate of CRE regarding the Entitlements and the Brownfield Tax Credits and certain milestones to be achieved in respect of obtaining the Entitlements and the Brownfield Tax Credits, in substantially the form set forth on Exhibit J, or (ii) in the event CRE or an Affiliate of CRE is no longer providing such services, such other agreement regarding the Entitlements as may be entered into by the Company from time to time in accordance with this Agreement.

"*Entitlements Date*" means the date on which the consultant under the Entitlements Agreement submits to the Board written third party verification that the Entitlements have been obtained.

"*Excess Advance*" has the meaning set forth in Section 4.8.

"*Excess Capital*" has the meaning set forth in Section 4.6.

"*Fiscal Quarter*" means any three-month period commencing on each of January 1, April 1, July 1 and October 1, and ending on the last date before the next such date.

"*Fiscal Year*" means (i) the period commencing upon the formation of the Company and ending on December 31, 2013, (ii) any subsequent twelve month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (ii) of this sentence for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Article 8 hereof.

"*FMV*" means the price at which a willing seller would sell and at which a willing buyer would purchase the Property free and clear of all liens and security interests, neither of whom is under any compulsion to sell or purchase.

"*Gross Asset Value*" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Board;

(ii)    The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (b) the distribution by the Company to a Member or Interest Holder of more than a *de minimis* amount of property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members;

(iii)   The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Board; and

(iv)    The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this

Section to the extent the Board unanimously determines that an adjustment is not necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to this Section, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

"*Guarantor*" means a Member or an Affiliate of a Member that enters into a Guaranty.

"*Guarantor Payment*" means a payment made by a Guarantor under a Guaranty that would reasonably and objectively be considered to be an expense or obligation of the Company (as determined by the Board); provided however that, except for that portion of any payment that constitutes a Guaranty Loan Pay-down, in no event shall any payment or obligation of a Guarantor that results from a Guaranty Triggering Act constitute a Guarantor Payment.

"*Guaranty*" means any completion guaranty, payment guaranty, operating deficit guaranty, bad boy or non-recourse carve-out guaranty, environmental indemnity or similar guaranty or indemnity.

"*Guaranty Loan Pay-down*" means any payment actually made by a Guarantor pursuant to a Guaranty as a consequence of a Guaranty Triggering Act that reduces the outstanding amount of the Loan (without giving effect to any increase in the outstanding amount of the Loan, including default interest, that results from the Guaranty Triggering Act in question).  For avoidance of doubt, (i) any payment in respect of indemnified damages (as opposed to a payment in respect of the outstanding amount of the Loan) that results from a Guaranty Triggering Act, and (ii) any payment obligation of (or payment made by) the Company or a Guarantor that results from such Guarantor's (or its Affiliate Member's) failure to fund its share of a Capital Contribution or Additional Advance, shall not be deemed to be a Guaranty Loan Pay-down.

"*Guaranty Triggering Act*" means a Guarantor's (i) intentional act, willful misconduct, gross negligence, or unlawful act, (ii) intentional or willful breach of any agreement to which it or the Company is a party, including any Loan Document or Guaranty, or (iii) violation of any bad boy or non-recourse carve-out guaranty, provided, however, that a Guaranty Triggering Act shall not be deemed to have occurred in any case where the Board, in writing, consented to or acquiesced in such act or failure to act by such Guarantor, such as the Board's refusal to call for an Additional Advance to pay Real Estate Taxes or Insurance Premiums in the case where there were insufficient revenues or reserves otherwise being available to the Company to make any such payment.

"*Immediate Family Member*" means, with respect to any natural Person, (i) that Person, (ii) that Person's spouse (but only during their marriage), (iii) that Person's ancestor's or descendants (natural or adopted), and (iv) any custodian or personal representative for (in each case, in its capacity as such), or trust set up for the benefit of, any Person described in clauses (i), (ii), or (iii) of this sentence).

"*Information*" has the meaning given it in Section 5.3.

"*Initial Capital Contributions*" has the meaning given it in Section 4.1.

"*Initial Closing*" has the meaning set forth in Section 16.2(b).

"*Initiating Member*" has the meaning given it in Article 15.

"*Insurance Premiums*" means insurance premiums for insurance policies that have been approved by the Board or that are reflected in the Development Budget or Annual Budget.

"*Internal Rate of Return*" or "*IRR*" means, with respect to any Member, an internal rate of return of the applicable percentage per annum, calculated and compounded on the aggregate sum of the Capital Contributions of such Member including amounts contributed prior to the date of formation of the Company, commencing on the date or dates that such Member's Capital Contributions are received by the Company, taking into account the timing and amounts of all distributions from the Company received by such Member under any provision of this Agreement. As an illustration, an investor has achieved or earned an IRR of x percent on an initial investment of y dollars when the net present value of all cash receipts and payments with respect to such initial investment, discounted at an interest rate of x percent, is equal to y. The XIRR function in Microsoft Excel, U.S. version 2003, or any other program approved by the Board and the Required Members, will be used to calculate IRR.

"*Interest*" or "*Membership Interest*" means a Member's entire interest in the Company, including a Member's Units, Member Loans, Excess Advances, Excess Capital, economic interest and right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement or the Act.

"*JSMB*" has the meaning given it in the Preamble.

"*JSMB Control*" means that the control of JSMB or the applicable Affiliate of JSMB remains in the same group as it exists as of the Effective Date.

"*JSMB Promote Member*" has the meaning given it in the Preamble.

"*JSMB Promote Member Control*" means that the control of the JSMB Promote Member remains in the same group as it exists on the Effective Date.

"*Loan*" means any loan (including the Construction Loan) made to or for the Company, a Property Co or the Property, other than any loan made by a Member.

"*Loan Documents*" means the various notes, mortgages, collateral assignments, certificates, indemnities, and other documents, instruments, agreements and certificates evidencing, securing or concerning a Loan.

"*Lot 10*" means the area identified as such within the CRE Restricted Area as shown on Exhibit L attached hereto.

"*Major Agreements*" means the Loan Documents and such other agreements in connection with the Project and the funding, development, construction, or operation thereof, the

breach of which by the Company or any Property Co would have a material adverse effect on the Company or any Property Co or that the Board designates as a Major Agreement.

"*Mandatory Distribution*" has the meaning set forth in Section 9.2.

"*Manresa*" has the meaning given it in the Preamble.

"*Manresa Approval Period*" means any period during which Manresa has not, as of the date of calculation, achieved an IRR of 12 percent based upon its total Capital Contributions and the Net Cash Flow and Capital Transaction Proceeds distributed to it in accordance with Article 9 and Exhibit C hereto.

"*Manresa Control*" means that the control of Manresa or the applicable Affiliate of Manresa remains in the same group as it exists as of the Effective Date or with in the same group within the Manresa Representative as it exists as of the Effective Date.

"*Manresa Representative*" means Quadrum Investment Management Limited, a limited company organized under the laws of the Cayman Islands (or any company or partnership carrying on its business from time to time).

"*Member*" or "*Members*" means any Person named as a member of the Company on Schedule A attached hereto and includes any Person subsequently admitted as a Member. Reference herein to Members shall be deemed to be references to Class A Members, Class B Members and Class C Members unless the provision or context provides or requires otherwise.

"*Member Agreement(s)*" means this Agreement, the Development Management Agreement, the Property Management Agreement, the Entitlements Agreement, and any other agreement between the Company or any Property Co, on the one hand, and any Member (or any of its Affiliates), on the other hand, in connection with the Project and the funding, development, construction, or operation thereof.

"*Member Control*" means, as applicable, (i) JSMB Control, with respect to a Transfer by JSMB; (ii) CRE Control, with respect to a Transfer by CRE; (iii) Manresa Control, with respect to a Transfer by Manresa; or (iv) JSMB Promote Member Control, with respect to a Transfer by JSMB Promote Member.

"*Member Fees*" means the fees payable to Members as set forth on Exhibit D hereto.

"*Member Loan*" has the meaning set forth in Section 4.7(c).

"*Member's Advance Share*" has the meaning set forth in Section 4.8(a).

"*Necessary Expenses*" means (i) Real Estate Taxes, (ii) Insurance Premiums, (iii) other amounts not to exceed US $100,000 that if not timely paid would result in the ability of the party to whom such payment is owed to lien or foreclose on the Property or the Company's interest in Property Co, and (iv) other amounts, not to exceed US $500,000, that (x) are required, as a result of an act or omission by a third party other than a Member or any of its Affiliates, to avoid a default by the Company or any Property Co under any Loan Document, and (y) do not result

from a failure by the Operating Member, Development Manager, or Property Manager to supervise or provide adequate direction, information, or resources to such third party.

"*Net Cash Flow*" means cash, revenues, and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company, all as determined by the Board: (i) all principal and interest payments on indebtedness of the Company (including any Member Loans, Excess Advance, or Excess Capital) and all other sums paid to lenders; (ii) all cash expenditures incurred in the operation of the Company's business; (iii) such reserves as the Board deems reasonably necessary for the proper operation of the Company's business. "Net Cash Flow" shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions of reserves previously established pursuant to the first sentence of this definition.

"*Non-Offering Member*" shall have the meaning set forth in Section 13.7.

"*Observer*" means any Person appointed to be a non-voting observer of the Board.

"*OFAC*" means the United States Department of the Treasury's Office of Foreign Assets Control.

"*Offering Member*" shall have the meaning set forth in Section 13.7.

"*Officer*" shall have the meaning set forth in Section 6.3.

"*Operating Member*" means the individual or entity appointed as manager of the Company in accordance with this Agreement. The initial Operating Member is appointed in Section 6.2 hereof.

"*Operating Shortfall*" means, at any time after the Substantial Completion Date, the amount needed to (i) meet payment obligations under the Other Agreements, (ii) pay Necessary Expenses, (iii) fund Reserves, or (iv) otherwise operate the Property, in each case to the extent the same exceeds the amounts of any Class A Member Budget Commitment set forth in the applicable Annual Budget, available cash, reserves or working capital available for the payment of the same or that has otherwise not been approved by Manresa in writing.

"*Other Agreements*" means the Property Co Agreement, if any, and the Loan Documents.

"*Percentage Interest*" means, with respect to any Member of a particular Class as of any date, the ratio (expressed as a percentage) of the number of Units of a particular Class held by such Member on such date to the aggregate Units of such Class held by all Members of such Class on such date. The initial Percentage Interests of the Members, by Class, are set forth on Schedule A.

"*Permitted Person*" means (i) the partners, members, shareholders, directors, officers and employees of a party, (ii) accountants, attorneys, consultants and other professionals engaged to render services in connection with the Property, (iii) lenders, potential lenders and potential purchasers of the Property, and (iv) lenders, potential lenders, and potential purchasers and assignees of a Member or a Member's interest in the Company.

"*Permitted Transfer*" has the meaning set forth in Section 13.2.

"*Permitted Transferee*" has the meaning set forth in Section 13.2. A Prohibited Person may not be a Permitted Transferee.

"*Person*" or "*person*" includes any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

"*Plans and Specifications*" means the architectural, mechanical, electrical and structural plans, studies, drawings, specifications, surveys, renderings and other technical descriptions that relate to the Property and are prepared in accordance with the Development Plan and approved, to the extent necessary, by the appropriate governmental authority, as the same may be amended from time to time in accordance with the Board approval requirements set forth herein.

"*Prime Rate*" means the annual rate of interest announced from time to time by The Wall Street Journal as the "Prime Rate," changing as and when such rate changes, unless a lesser rate shall then be the maximum rate permissible by law with respect to the matter for which interest is being computed, in which case such lesser rate shall be charged, or in the event The Wall Street Journal no longer publishes a "Prime Rate," such other similar rate of interest published or announced from time to time by a similar publication or major bank with offices in New York, New York chosen by the Board.

"*Profits*" and "*Losses*" mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

        (i)      Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be added to such taxable income or loss;

        (ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition of "Profits" and "Losses" shall be subtracted from such taxable income or loss;

        (iii)    In the event the Gross Asset Value of any of the Company's assets is adjusted pursuant to this Section, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits and Losses;

        (iv)    Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of as of the date of the disposition of such property, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

(v)     In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year, computed in accordance with this Section;

(vi)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is required, pursuant to Treasury Regulations Section 1.704-(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) from the disposition of such asset and shall be taken into account for purposes of computing Profits or Losses in accordance with clause (iv) above;

(vii)   Notwithstanding any other provision of this definition of "Profits" and "Losses", any items that are specially allocated pursuant to the terms of this Agreement shall not be taken into account in computing Profits or Losses;

The amounts of the items of Company income, gain, loss or deduction to be specially allocated pursuant to the terms of this Agreement shall be determined by applying rules analogous to those set forth in clauses (i) through (vi) above.

"*Profits Units*" has the meaning set forth in Section 2.3.

"*Project*" means the acquisition of the Site and the construction, development, ownership, operation, maintenance and repair of the Building on the Site.

"*Project Suspension*" means that the Company has elected to suspend development of the Project and at that time has no plans to resume the Project within the ensuing six months.

"*Prohibited Person*" means (i) any Person, group or entity named as a "Specially Designated National and Blocked Person" or as a Person who commits, threatens to commit, supports, or is associated with terrorism as designated OFAC, (ii) any Person, group or entity named in the lists maintained by the United States Department of Commerce (Denied) Persons and Entities, (iii) any government or citizen of any country that is subject to a United States Embargo identified in regulations promulgated by OFAC, (iv) any Person, group or entity named as a denied or blocked Person or terrorist in any other list maintained by any agency of the United States government, and (v) any Person that has been convicted of a felony, fraud or a crime of moral turpitude, or that has a reputation that would adversely affect the operation and management of the Property.

"*Promote*" means the amounts payable to JSMB Promote Member in accordance with Sections 2(b), 3(b) and 4(b) under the caption "Distribution Priority (After Entitlements)" in Exhibit C.

"*Property*" means the Site, the Building and all assets of the Company or Property Co used or useful in connection therewith.

"*Property Co*" means one or more other entities or subsidiaries in which the Company has a material direct or indirect ownership interest for the pursuit of the Property, including CSC 4540 PROPERTY CO, LLC, a New York limited liability company, a wholly owned subsidiary of the Company.

"*Property Co Agreement*" means the constituent or governing agreements of a Property Co, as amended or supplemented from time to time, including that certain LIMITED LIABILITY COMPANY AGREEMENT OF CSC 4540 PROPERTY CO, LLC of even date herewith.

"*Property Management Agreement*" means (i) that certain PROPERTY MANAGEMENT AGREEMENT to be entered into between the Company (or a Property Co) and Property Manager regarding the management of the Building, in substantially the form set forth on Exhibit I, or (ii) in the event Property Manager no longer manages the Property, such other agreement to manage the Property as may be entered into by the Company from time to time.

"*Property Manager*" means SDG PROPERTY MANAGEMENT LLC, a New York limited liability company, the manager of the Property under the Property Management Agreement.

"*Qualified Offer*" shall have the meaning set forth in Section 13.8 hereof.

"*Real Estate Taxes*" means general real estate taxes and assessments payable with respect to the Property that are imposed by any authority having the power to tax any legal or equitable interest of the Company or Property Co in the Property.

"*Recognized Lender*" shall mean (i) any foreign or domestic commercial bank, savings and loan association, trust company or insurance company and any foreign or domestic nationally respected lender-mortgagee (such as an eleemosynary institution or foundation, publicly held corporation, real estate investment trust, pension fund or the like), (ii) any investment bank, (iii) any other entity generally recognized to be of institutional quality and customarily involved in the business of the lending of money or (iv) any conduit, corporation other entity created in connection with a public or private offering conducted or sponsored by an investment bank or any of the entities described in clause (i) above for the purpose of lending money to a Member or one of its Affiliates. A Prohibited Person shall in no event qualify as a Recognized Lender.

"*Required Interest Rate*" means the lesser of (A) the interest rate set forth in the Required Interest Rate and Conversion Factor Schedule attached hereto as Exhibit E based upon the nature of the funded amount and the identity of the funding party, and (B) the maximum rate permitted by applicable law. By way of example, based upon the Required Interest Rate and Conversion Factor Schedule, the Required Interest Rate for any amounts funded by Manresa in respect of a Member Loan for an Operating Shortfall pursuant to Section 4.7 is 18 percent.

"*Reserve Amount*" means such reserves as the Board deems reasonably necessary (including as may be required under any of the Other Agreements) for the proper operation of the Company's business, including reserves for accounts payable, debt services, current and future

capital expenditures, and other liabilities or obligations of the Company, or for such other purposes as the Board may determine to be necessary, such reserves to be set out in the Annual Budget.

"*Responding Member*" has the meaning given it in Article 15.

"*Responding Member's Arbitration Notice*" has the meaning given it in Article 15.

"*Sale Interest*" means (i) in the case of a Transfer described under Sections 13.7, 13.8, or 13.9, the interest proposed to be transferred by a Member that is specified in its written notice given pursuant to Section 13.7(a), and (ii) in the case of a Transfer described in Article 15, a Member's entire Membership Interest.

"*Site*" means those certain parcels of real property commonly known as 45-40 Vernon Boulevard, Long Island City, New York.

"*Substantial Completion Date*" means the date that (i) the residential portion of the Project has been completed pursuant to the Plans and Specifications, subject to punch list items that do not materially interfere with the ability to use the residential portion of the Project for its intended purpose, and is available for occupancy by residential tenants, as certified by the Project's architect, and (ii) the commercial portion of the Project has been completed pursuant to the Plans and Specifications (i.e., as a "vanilla" shell), subject to punch list items that do not materially interfere with the ability to build out the commercial portion of the Project for the commercial tenant(s), as certified by the Project's architect. Any portion of the Project may be opened for residential or commercial use, as applicable, upon receipt of the Certificate of Occupancy for such portion of the Project, even if prior to the Substantial Completion Date.

"*Suspended Entitlements Date*" means, in the case of a Project Suspension, the date set forth on Exhibit C of the Entitlements Agreement (as it exists on the date of Project Suspension) as the date the Entitlements were expected to be obtained.

"*Tag-Along Members*" has the meaning set forth in Section 13.8 hereof.

"*Tag-Along Notice*" has the meaning set forth in Section 13.8 hereof.

"*Tag-Along Offer*" has the meaning set forth in Section 13.8 hereof.

"*Target Capital Account Balance*" means, with respect to a Member, the respective net amount, positive or negative, that would be distributed to such Member or for which such Member would be liable to the Company under this Agreement, determined as if the Company were to (a) sell all of the assets of the Company for cash in an amount equal to the Gross Asset Value of such assets and (b) distribute the net proceeds of such sale pursuant to Article 14 of this Agreement. In addition, the Target Capital Account Balance of a Member as determined above shall be adjusted by debiting it in an amount equal to the sum of the Member's share of the Company's "partnership minimum gain" (as determined according to Treasury Regulations Section 1.704-2(g)) and such Member's "partner nonrecourse debt minimum gain" (as determined according to Treasury Regulations Section 1.704-2(i)(3)). The Target Capital

Account Balance shall be calculated from inception and adjusted for each Member each time at the end of each period for which an allocation of Profits or Losses is to be made.

*"Tax Matters Member"* has the meaning set forth in Code Section 6231 with respect to a Tax Matters Partner.

*"Tax Percentage"* for any year means the highest marginal tax rate, for United States federal and state income tax purposes, applicable to any Member or, if any Member is a pass-through entity for federal income tax purposes, the highest marginal tax rate applicable to the Person which is the ultimate tax-paying owner of such Member, as reasonably determined by the Board. In determining the Tax Percentage, the Board shall take into account the character of the relevant income or loss of the Company and the deductibility of state taxes in computing federal income tax liability.

*"Transfer"* means, as a noun, the sale, gift, pledge, assignment, transfer, transfer in trust, mortgage, alienation, hypothecation, encumbering or disposition of an interest in the Company in any manner, directly or indirectly, whatsoever, voluntarily or involuntarily, including, without limitation, any attachment, assignment for the benefit of creditors, pledge or transfer of an economic interest in the Company or transfer by operation of law or otherwise and, as a verb, voluntarily or involuntarily to transfer, sell, pledge or hypothecate or otherwise dispose of directly or indirectly.

*"Treasury Regulations"* means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

*"Unit"* means a unit of interest in the Company representing such fractional part of the interests of all Members and Economic Interest Owners, if any, as is equal to one divided by the total number of Units. The allocation of Units shall be as set forth on Schedule A.

*"Unit Certificate"* has the meaning set forth in Section 4.2.

*"Unpaid Excess(es)"* has the meaning set forth in Section 4.9.

*"Unreturned Capital Account"* means as of any relevant time the excess of the Capital Contributions of a Member over all distributions made to such Member pursuant to Section 9.1 as of such time.

*"Unreturned Excess Advance Account"* means as of any relevant time the excess of the Excess Advances of a Member not converted by such Member to a Capital Contribution as provided in Section 4.9 over payments to such Member pursuant to Section 4.8 as of such time.

*"Unreturned Excess Capital Account"* means as of any relevant time the excess of the Excess Capital of a Member not converted by such Member to a Capital Contribution as provided in Section 4.9 over all payments to such Member pursuant to Section 4.6 as of such time.

"*Unreturned Member Loan Account*" means as of any relevant time the excess of the Member Loans of a Member not converted by such Member to a Capital Contribution as provided in Section 4.9 over payments to such Member pursuant to Section 4.7 as of such time.

"*Withdrawal Event*" has the meaning set forth in Section 14.3.

"*Withdrawing Member*" means a Member who suffers a Withdrawal Event.

Section 1.2    Rules of Construction.

(a)    Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

(b)    All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement, and all references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

(c)    The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

(d)    Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party that drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

(e)    The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

(f)    The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

(g)    The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

(h)    The word "shall," means "has a duty to."

ARTICLE 2
ORGANIZATION AND TERM

Section 2.1    Organization.

(a)    The Company was organized as a limited liability company under the Act by filing the Articles in New York. The Members agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Nika Palama is hereby designated as an "authorized person" within the meaning of the Act, and such "authorized person" has executed, delivered and filed the Articles with the Secretary of State of the State of New York. The Members hereby ratify, confirm and approve all such actions heretofore taken by Nika Palama by or on behalf of the Company in connection with the organization of the Company, in all respects as the act and deed of the Company. Upon the filing of the Articles, his/her power as an "authorized person" ceased, and the Operating Member thereupon became the designated "authorized person" and shall continue as the designated "authorized person" within the meaning of the Act until the Board determines otherwise.

(b)    The Members hereby adopt and approve this Agreement as the limited liability company agreement of the Company as of the Effective Date. Unless a provision of the Act expressly provides that the Act supersedes any provision contained in this Agreement, the terms and conditions of this Agreement, as the same may be amended, shall govern.

(c)    The name, mailing address, Capital Commitments, Initial Capital Contributions and Units of each Member and Economic Interest Owner shall be listed on Schedule A attached hereto. The Board shall update Schedule A from time to time as necessary to accurately reflect the information therein. Any amendment or revision to Schedule A made in accordance with this Agreement shall not be deemed an amendment to this Agreement. Any reference in this Agreement to Schedule A shall be deemed to be a reference to Schedule A as amended and in effect from time to time.

Section 2.2    Name. The name of the Company is CSC 4540, LLC. The business of the Company may be conducted upon compliance with all applicable laws under any other name designated by the Board.

Section 2.3    Members; Classes of Members; Member Units.

(a)    Manresa, JSMB, JSMB Promote Member, and CRE are the only current Members of the Company. New Members may be added to the Company only upon the approval of the Board or in accordance with Section 4.10 or Article 13 hereof.

(b)    There shall be three classes of Units and Members of the Company: (i) the Class A Members who own Class A Units, (ii) the Class B Members who own Class B Units, and (iii) the Class C Members who own Class C Units. The Class A Members, the Class B Members and the Class C Members will have an interest in the profits, losses, distributions and capital of the Company as further set forth herein, but only the Class A Members will have any voting or management rights. Manresa and JSMB shall be the Company's sole initial Class A Members, CRE shall be the Company's sole initial Class B Member, and JSMB Promote Member shall be the Company's sole Class C Member. Schedule A sets forth the Members and the number of

Units they own by class. References herein to Members shall be deemed to be references to Class A Members, Class B Members, and Class C Members, and references herein to Units shall be deemed to be references to Class A Units, Class B Units, and Class C Units, unless the provision or context provides or requires otherwise.

(c)     The Class A Units and the Class B Units are "*Capital Units*," in that the Members owning such Units have Capital Commitments and have made or committed to make the Capital Contributions described on Schedule A with respect to such Capital Units. The Class C Units are "*Profits Units*," which are intended to be treated as "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43 and which do not require a Capital Commitment or any Capital Contributions. Reference herein to Units shall be deemed to be references to Capital Units and Profits Units unless the provision or context provides or requires otherwise.

(d)     The Class B Member and the Class C Member agree to be members of the Company for the limited purposes provided herein and to perform their respective obligations as the Class B Member or the Class C Member, as applicable, hereunder, and the Class A Members agree that the Class B Member and Class C Member will be members of the Company solely for such limited purposes. The Members agree that the Class B Member and Class C Member, in accordance with Section 408 and other relevant provisions of the Act, (i) will have no management, approval, voting, consent or veto rights in the Company, except for the right to approve amendments to this Agreement in accordance with Section 5.10 hereof; and (ii) will have no, and each of the Class B Member and Class C Member hereby waives, any right to seek the appointment of a receiver or apply for judicial dissolution of the Company. Neither the Class B Member nor the Class C Member may bind the Company in any manner.

(e)     The Company may issue to each Member or Economic Interest Holder that owns Units a limited liability company certificate with respect to such Units, in the form approved by the Board, evidencing the Units held by such Member (each such certificate a "*Unit Certificate*"). For purposes of Article 8 of any Uniform Commercial Code, each Unit evidenced by a Unit Certificate shall be deemed to be a security, as such term is defined in any Uniform Commercial Code.

Section 2.4     Term. The term of the Company commenced on the date the Articles were filed in the office of the Secretary of State of the State of New York and shall continue in perpetuity, unless otherwise dissolved in accordance with the provisions of this Agreement.

Section 2.5     Registered Office. The Company's registered office in New York is c/o Simon Development Group, 230 Park Avenue, Suite 539, New York, New York 10169, Attention Matthew M. Baron. At any time, the Board may designate another registered office.

Section 2.6     Principal Place of Business. The principal place of business of the Company shall be at c/o Simon Development Group, 230 Park Avenue, Suite 539, New York, New York 10169. Upon ten days' prior notice to the Members, the Board may change the location of the Company's principal place of business to another location in New York, New York.

Section 2.7    Qualification in Other Jurisdictions.  The Board may cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business.  At the direction of the Board, the Operating Member, as an authorized person within the meaning of the Act, may execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

Section 2.8    Tax Status.  The Company shall, to the extent permissible, elect to be treated as a partnership for federal, foreign, state and local income tax purposes; each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment.  The Company shall not be deemed a partnership or joint venture for any other purpose.

Section 2.9    Ownership.  All property and interests in property, real or personal, owned by the Company will be deemed owned by the Company as an entity, and no Member (in its capacity as such) will have any ownership of such property or interest therein except by having an ownership interest in the Company as a Member.

ARTICLE 3
PURPOSE AND POWERS OF THE COMPANY

Section 3.1    Purpose.  The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is (a) to own direct or indirect interests in any Property Co in accordance with the applicable Property Co Agreement; (b) to act as manager or general partner of any Property Co; (c) on its own behalf or through any Property Co or otherwise to (i) to acquire, develop, lease, own, operate and manage the Property, (ii) to obtain or assume financing for the Property, (iii) to renovate, rehabilitate and market the Property, (iv) to sell, assign, lease, carry, transfer, sublet and otherwise dispose of all or a portion of the Property; (d) to sell or otherwise dispose of its ownership interests in any Property Co; and (e) to engage in any and all activities necessary or incidental to the foregoing and any other legal business necessary or incidental to the foregoing.

Section 3.2    Powers of the Company.  Subject to any approval requirements set forth herein, the Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, incidental or convenient to or for the furtherance of the purposes set forth in Section 3.1, including, but not limited to, the power:

(a)    to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any state, territory, district or possession of the United States, or in any foreign country that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(b)    to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge or otherwise dispose of, and otherwise use and deal in

and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, trusts or limited liability companies;

(c)     to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with the Operating Member or any Member or any Affiliate of any of them, or any agent of the Company necessary to, in connection with, convenient to, or incidental to the accomplishment of the purposes of the Company, so long as any such contract is on terms set forth in this Agreement or in a Member Agreement or on terms no less favorable to the Company in any material respect than terms that would pertain had such contract been with a third party;

(d)     to lend money (other than to Members or Economic Interest Owners);

(e)     to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

(f)     to appoint officers, employees and agents of the Company, and define their duties and fix their compensation;

(g)     to indemnify any Person in accordance with the Act;

(h)     to cease its activities and cancel its Articles;

(i)     to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any contract or security agreement in respect of any assets of the Company;

(j)     to borrow money and issue evidences of indebtedness, and to secure the same by a mortgage, pledge or other lien on the assets of the Company;

(k)     to take actions to protect and preserve the Company's assets, including insuring the business and assets of the Company against risks;

(l)     to hold Company assets in the name of the Company or in the name of one or more nominees;

(m)     to open one or more bank accounts in the name of the Company or in any other name in which the Company's funds are to be held, make deposits therein, draw funds therefrom and deal in or with the Company's funds;

(n)     to make distributions of the Company's funds or assets to the Members and Economic Interest Owners, if any, as provided for by this Agreement;

(o)     to make such income tax elections as may be appropriate or desirable, as contemplated by the Code and the Treasury Regulations; prepare and file tax returns for the Company with federal, state and local authorities; file amendments to such returns; participate in audits of such returns; consent to extensions relating to such returns; execute documents relating to the settlement of tax proceedings involving the Company or its tax returns; participate in administrative and judicial proceedings, including appeals, relating to the Company's tax returns

or its tax liabilities; and settle issues relating to the Company's federal and, to the extent required, state and local income tax returns even though the Members and Economic Interest Owners, if any, rather than the Company shall be subject to tax as so determined;

(p)     to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities; and

(q)     to make, execute, acknowledge and file any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purposes of the Company.

ARTICLE 4
CAPITAL CONTRIBUTIONS, UNITS,
CAPITAL ACCOUNTS AND ADVANCES

Section 4.1     Capital Contributions. Each Class A Member has committed to contribute to the capital of the Company as its Capital Commitment (i) the amount (in cash or property as further set forth in the Capital Contribution Agreement) set forth opposite its name under the column "Capital Commitment" on Schedule A attached hereto, as such schedule may be amended from time to time, and (ii) its share of any Class A Member Budget Commitment in exchange for the Capital Units set forth opposite its name on Schedule A in the column headed "Units." The Class B Member has committed to contribute to the capital of the Company as its Capital Commitment the amount (in cash or property as further set forth in the Capital Contribution Agreement) set forth opposite its name under the column "Capital Commitment" on Schedule A attached hereto, as such schedule may be amended from time to time, in exchange for the Capital Units set forth opposite its name on Schedule A in the column headed "Units." The Members' initial Capital Contributions (as set forth on Schedule A, "*Initial Capital Contributions*") shall be fully funded as of the Contribution Date, and the remainder of the Class A Members' Capital Commitments, if any, shall be funded in accordance with Section 4.6. The Initial Capital Contribution of the Class B Member is equal to its entire Capital Commitment, so it has no remaining Capital Commitment. The Class C Member, owning only Profits Units, has not committed to make any Capital Contributions and has no Capital Commitment. The Capital Commitment and Capital Contributions of any Member or Economic Interest Owner who acquires an interest in the Company by virtue of an assignment in accordance with the terms of this Agreement shall be in the same amount as, and shall replace, the Capital Commitment and Capital Contributions of the assignor of such interest relating to the interest that was transferred, and, for purposes of this Agreement, such Member or Member or Economic Interest Owner shall be deemed to have made the Capital Contributions made by the assignor of such interest (or made by such assignor's predecessor in interest) relating to the interest that was transferred.

Section 4.2     Units.     A Member's or Economic Interest Owner's interest in the Company shall be represented by the "*Unit*" or "*Units*," or any fractional part thereof, held by such Member or Economic Interest Owner. Each Member's and Economic Interest Owner's respective Units shall be as set forth on Schedule A attached hereto, and thereafter shall be subject to adjustment as set forth herein. All interests in the Company and Units shall for all purposes be personal property. A Member or Economic Interest Owner has no interest in specific Company property. A Member's right to receive distributions of Net Cash Flow and

Capital Transaction Proceeds shall be made in the order and priority set forth in Section 9.1 and Exhibit C, which may or may not be based upon a Member's Units, Percentage Interests, Capital Contributions, or Capital Accounts.

Section 4.3    Status of Capital Contributions.

(a)    No Member or Economic Interest Owner shall have the right to withdraw its Capital Contribution or to receive any interest, salary or draw with respect to its Capital Contributions or for services rendered on behalf of the Company or otherwise in its capacity as a Member or Economic Interest Owner, except as otherwise specifically provided in this Agreement.

(b)    Except as otherwise provided herein, the Members and Economic Interest Owners shall be liable only to fund the full amount of their Capital Commitments pursuant to Sections 4.1 and 4.6 hereof, and no Member or Economic Interest Owner shall be required to contribute or advance any additional funds to the Company, provided that the foregoing shall not reduce or limit the rights granted herein to Members that contribute or advance such additional funds, including, without limitation, contributions or advances in respect of a Member that does not contribute or advance its entire share of such additional funds.

(c)    No Member or Economic Interest Owner shall have any personal liability for the repayment of any Capital Contribution, Member Loans, Excess Advance, or Excess Capital of any other Member or Economic Interest Owner. No Member or Economic Interest Owner shall be obligated to restore a negative balance in such Member's or Economic Interest Owner's Capital Account.

Section 4.4    Capital Accounts.

(a)    An individual Capital Account shall be established and maintained for each Member and Economic Interest Owner. The original Capital Account established for any Member or Economic Interest Owner who acquires an interest in the Company by virtue of an assignment in accordance with the terms of this Agreement shall be in the same amount as, and shall replace, the Capital Account of the assignor of such interest, and, for purposes of this Agreement, such Member or Economic Interest Owner shall be deemed to have made the Capital Contributions made by the assignor of such interest (or made by such assignor's predecessor in interest). To the extent such Member or Economic Interest Owner acquires less than the entire interest in the Company of the assignor of the interest so acquired by such Member or Economic Interest Owner, the original Capital Account of such Member or Economic Interest Owner and its Capital Contributions shall be in proportion to the interest it acquires, and the Capital Account of the assignor who retains a partial interest in the Company, and the amount of its Capital Contributions, shall be reduced to the proportion of the interest it retains.

(b)    The Capital Account of each Member and Economic Interest Owner shall be maintained in accordance with the following provisions:

(i)    to such Member's or Economic Interest Owner's Capital Account there shall be credited such Member's or Economic Interest Owner's Capital Contributions (including the amount of any Unpaid Excess that is converted to a Capital Contribution in accordance with

Section 4.9), such Member's or Economic Interest Owner's distributive share of Profits and the amount of any Company liabilities that are assumed by such Member or Economic Interest Owner or that are secured by any Company assets distributed to such Member or Economic Interest Owner;

(ii)     to such Member's or Economic Interest Owner's Capital Account there shall be debited the amount of cash (including Net Cash Flow and Capital Transaction Proceeds) and the Gross Asset Value of any Company assets (less the amount of any liabilities to which such asset is subject) distributed to such Member or Economic Interest Owner pursuant to any provision of this Agreement, such Member's or Economic Interest Owner's distributive share of Losses and the amount of any liabilities of such Member or Economic Interest Owner that are assumed by the Company or that are secured by any property contributed by such Member or Economic Interest Owner to the Company; and

(iii)     in determining the amount of any liability for purposes of this Section 4.4(b), there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and the Treasury Regulations.

Section 4.5     Prohibition Against Withdrawals. No Member or Economic Interest Owner shall have the right to withdraw all or any portion of its Capital Contribution or Capital Account or to receive any payment of interest thereon.

Section 4.6     Capital Calls.

(a)     The Board, Manresa, or JSMB, acting in good faith, may, from time to time, call for the Class A Members to contribute to the capital of the Company any unfunded portion of their respective Capital Commitments (including any Class A Member Budget Commitment) in proportion and up to their respective Capital Commitments by sending to each Class A Member a notice thereof which shall set forth, among other things, the amount of the Capital Contribution to be made by each Class A Member and the period within which such Capital Contribution shall be made, which shall be no sooner than 15 business days after receipt of such notice (each such call, a "*Capital Call*").

(b)     In the event a Class A Member fails to make its portion of a Capital Call (such Class A Member, a "*Defaulting Member*"), each of the other Class A Members that has made its portion of such Capital Call may thereafter make, in proportion to their respective Units or as otherwise agreed among them, such Defaulting Member's share of the Capital Call (the amount so advanced on behalf of the Defaulting Member is referred to as "*Excess Capital*").

(c)     Except as hereinafter provided in Section 4.9, the amount of any such Excess Capital shall be treated as a loan to the Company and shall bear interest at a *per annum* rate equal to the Required Interest Rate. Any Excess Capital shall be repaid, prior to any repayment to the Members of Member Loan and Excess Advances, or interest thereon, and any distributions to the Members in accordance with Section 9.1, as follows:

(i)     First, to the Members, in payment of accrued but unpaid interest on any Excess Capital not theretofore repaid, *pro rata* in accordance with the respective amounts of accrued but unpaid interest on any Excess Capital due the Members; and

(ii)     Second, to the Members in proportion to, and to the extent of, their respective Unreturned Excess Capital Accounts.

(d)     In addition, a Defaulting Member may, at any time prior to the Conversion Deadline, repay to the advancing Member(s) all or any portion of any Excess Capital resulting from such Defaulting Member's failure to make the applicable Capital Call, with interest at the rate set forth above to the date so repaid, whereupon the principal portion of the Excess Capital so repaid shall be deemed to be a Capital Contribution by the Defaulting Member as of the date that the advancing Member(s) funded such portion of the Excess Capital.

(e)     In the event that JSMB or any of its Affiliates (other than the Company or any Property Co) defaults under any Loan Document to which it is a party (after expiration of applicable notice and cure periods thereunder), and Manresa cures such default by the payment of money or posting of any cash collateral, the amount so paid or posted by Manresa, plus any legal fees or other costs incurred by Manresa or the Company, shall be deemed to be Excess Capital for all purposes of this Agreement.

Section 4.7     Additional Advances.

(a)     In the event (i) the Board, acting in good faith, determines from time to time that the Company is in need of additional funds for the Property in accordance with the Development Budget or the applicable Annual Budget (in excess of any Class A Member Budget Commitment set forth in such budget); (ii) Manresa, acting in good faith, determines from time to time that additional funds are required to meet Operating Shortfalls or Construction Cost Overruns; (iii) any Class A Member, acting in good faith, determines from time to time that additional funds are required to fund Necessary Expenses, or (iv) any Class A Member, acting in good faith, determines from time to time that additional funds should be requested by the Company to pay or reimburse a Guarantor for a Guarantor Payment, then the Board may seek to obtain such additional funds from one or more third-party lenders.

(b)     If the Board is unable to (or elects not to) borrow all such other additional needed funds from a third-party lender within a reasonable time under the circumstances (not to exceed 30 days), then the Board may (in the case of Section 4.7(a)(i) above) or shall (in the case of Sections 4.7(a)(ii), 4.7(a)(iii), and 4.7(a)(iv) above), from time to time, request additional funds from the Class A Members (an "*Additional Advance*"). All Additional Advances requested from the Class A Members shall be in proportion to their respective Class A Units.

(c)     If the Board requests an Additional Advance, it shall send to each Class A Member a notice thereof which shall set forth, among other things, the amount and purpose of the Additional Advance to be made by each Class A Member, the period within which such Additional Advance shall be made (which shall be no sooner than 15 business days after receipt of such notice), and whether such Additional Advance will be a Capital Contribution or a loan by the Members to the Company (a "*Member Loan*"). Notwithstanding any provision hereof to the contrary, any portion of an Additional Advance called to pay Real Estate Taxes or Insurance Premiums shall be called as a Capital Contribution.

(d)     No Member shall have any obligation to contribute or advance any additional funds to the Company whether or not the Board has requested any Additional Advance, provided that the foregoing shall not reduce or limit the rights granted herein to Members that contribute or advance such additional funds, including, without limitation, contributions or advances in respect of a Class A Member that does not contribute or advance its entire share of such Additional Advance.

(e)     Except as hereinafter provided in Section 4.9, in the event the Board determines that the Additional Advance will be a Member Loan, then the Member Loan shall bear interest at a *per annum* rate equal to the Required Interest Rate.  Any Member Loan shall be repaid, prior to any distributions to the Members in accordance with Section 9.1, as follows:

(i)     First, to the Members, in payment of accrued but unpaid interest on any Member Loan not theretofore repaid, *pro rata* in accordance with the respective amounts of accrued but unpaid interest on any Member Loan due the Members; and

(ii)     Second, to the Members in proportion to, and to the extent of, their respective Unreturned Member Loan Accounts.

Section 4.8     Excess Advance.

(a)     In the event the Board has requested an Additional Advance, but at least one Class A Member has elected not to make its share of the Additional Advance (whether such Additional Advance is a Capital Contribution or a Member Loan), each other Class A Member that has made its share of the Additional Advance may thereafter (i) in the case where such Additional Advance was a Member Loan, elect to convert all or any portion of its share of the Additional Advance to a Capital Contribution as hereinafter provided in Section 4.9 (the amount of such an advancing Member's share of the applicable Additional Advance is referred to as the "*Member's Advance Share*"), and/or (ii) make such non-advancing Member's share of the Additional Advance (the amount so advanced on behalf of the non-advancing Member is referred to as an "*Excess Advance*").  If more than one Class A Member desires to make such non-advancing Member's share of the Additional Advance, the advancing Member(s) shall make such advance in proportion to their respective Class A Units or as otherwise agreed among them.

(b)     Except as hereinafter provided in Section 4.9, the amount of any such Excess Advance shall be treated as a loan to the Company and shall bear interest at a *per annum* rate equal to the Required Interest Rate.  Any Excess Advance shall be repaid, prior to any repayment to the Members of Member Loans, or interest thereon, and any distributions to the Members in accordance with Section 9.1, as follows:

(i)     First, to the Members, in payment of accrued but unpaid interest on any Excess Advance not theretofore repaid, *pro rata* in accordance with the respective amounts of accrued but unpaid interest on any Excess Advance due the Members; and

(ii)     Second, to the Members in proportion to, and to the extent of, their respective Unreturned Excess Advance Accounts.

(c)     In addition, a non-advancing Member may, at any time prior to the Conversion Deadline, repay to the advancing Member(s) all or any portion of an Excess Advance resulting from such non-advancing Member's failure to make the applicable Additional Advance, with interest at the rate set forth above to the date so repaid. Upon such timely repayment, the amount of the Additional Advance so repaid shall be deemed to be a Capital Contribution or a Member Loan (as determined in accordance with Section 4.7(c) above) by such non-advancing Member.

Section 4.9     Unpaid Excess. Notwithstanding the foregoing to the contrary, any Member who has contributed Excess Capital, or who has made a Member's Advance Share or an Excess Advance, any portion of which has not been repaid by the Company or by the non-advancing Member(s) as provided in Sections 4.6, 4.7, or 4.8, as applicable, within 180 days after the date the applicable contribution or advance is made (such unpaid portion, together with any accrued but unpaid interest thereon until paid or converted to a Capital Contribution as hereinafter provided, is referred to in the aggregate as the "*Unpaid Excess*"), may elect, by written notice to the Board and the other Members (each such notice, a "*Conversion Notice*") to convert all or any portion of such unpaid portion to a Capital Contribution. Such conversion shall become effective as of the Conversion Deadline unless the Company or the non-advancing Member(s), as applicable, has repaid the Unpaid Excess to which such Conversion Notice relates prior to the Conversion Deadline. "*Conversion Deadline*" shall mean the date that is 15 days after delivery of a Conversion Notice.

If the Unpaid Excess is so converted, as of the effective date of such conversion, the Class A Units of the electing Member shall be increased, and the Class A Units of the non-advancing Member shall be decreased, by an amount equal to (A) *the product of* (x) the applicable Conversion Factor, *times* (y) the amount of Unpaid Excess such Member is converting to a Capital Contribution, *times* (z) the total number of Class A Units currently outstanding, *divided by* (B) the sum of all Class A Members' and Economic Interest Owners' Capital Contributions to date. An example of this calculation is set forth on Exhibit F attached hereto.

Section 4.10     Additional Members and Units.

(a)     The Company is authorized to raise additional capital by offering and selling, or causing to be offered and sold, additional Interests in the Company ("*Additional Units*") to any Person in such amounts and on such terms as the Board may determine. Each Class A Member shall have the right to purchase its *pro rata* share (based on the relative number of Class A Units held) of such Additional Units on such terms as the Board may determine. Each Person not a Member who subscribes for any of the Additional Units shall be admitted as an additional member of the Company (each, an "*Additional Member*" and collectively, the "*Additional Members*") at the time such Person (i) executes this Agreement or a counterpart of this Agreement and (ii) is named as a Member on Schedule A hereto. If the Company sells Additional Units because a Member did not fund its entire share of a Capital Call or Additional Advance pursuant to Sections 4.6 or 4.7, then the dilutive effects of selling the Additional Units shall be absorbed by the Member(s) that have failed to fund in full their *pro rata* share of the applicable Capital Call or Additional Advance (to the extent of the amount not funded) based upon the number of and total amount contributed for the Additional Units. The legal fees and expenses of the Company associated with such admission shall be borne by the Company.

(b)     Additional Units shall not be entitled to any retroactive allocation of the Company's income, gains, losses, deductions, credits or other items; *provided, however*, that, subject to the restrictions of Section 706(d) of the Code, Additional Units shall be entitled to their respective share of the Company's income, gains, losses, deductions, credits and other items arising under contracts entered into or from securities acquired before the effective date of the issuance of any Additional Units to the extent that such income, gains, losses, deductions, credits and other items arise after such effective date. To the extent consistent with Section 706(d) of the Code and Treasury Regulations, the Company's books may be closed at the time Additional Units are issued (as though the Company's tax year had ended) or the Company may credit to the Additional Units *pro rata* allocations of the Company's income, gains, losses, deductions, credits and items for that portion of the Company's Fiscal Year after the effective date of the issuance of the Additional Units, as determined by the Board in its sole discretion.

Section 4.11     Certain Agreements Regarding Guaranties; Contribution Agreement. Neither Manresa nor CRE (or any of their respective Affiliates) shall be obligated to provide any Guaranty. If any lender providing the initial Construction Loan requires that a party provide any completion guaranty and/or a bad boy or non-recourse carve-out guaranty, then, so long as JSMB (or any of its Affiliates) is a Member of the Company at the time such Loan closes, JSMB or one or more of its Affiliates shall provide any such Guaranty, so long as it is on terms acceptable to JSMB in its sole discretion. If any lender providing any other Loan requires that a party provide a bad boy or non-recourse carve-out guaranty, then, so long as JSMB (or any of its Affiliates) is a Member of the Company at the time such Loan closes, JSMB or one or more of its Affiliates shall provide any such Guaranty, so long as it is on terms acceptable to JSMB in its sole discretion. Neither JSMB nor any of its Affiliates shall be obligated to provide any other Guaranty except as it may determine to do so in its sole discretion.

## ARTICLE 5
## MEMBERS

Section 5.1     Powers of Members. The members of each class of Members shall solely have the power to exercise any and all rights or powers granted to such class of Members pursuant to the express terms of this Agreement. The Class A Members shall also have the power to authorize the Board or the Operating Member to possess and exercise any right or power not already vested in the Board or the Operating Member pursuant to Section 6.2 or any other provision of this Agreement.

Section 5.2     Covenants of Members. Each Member, in its capacity as such, agrees to, and each Director appointed by a Member shall use his powers to provide that such Member or Director, as applicable, to the extent permitted by law, shall:

(a)     act towards the other Members in all matters relating to this Agreement and the Company in good faith;

(b)     exercise its respective rights and powers under this Agreement and its rights attaching to its Units to ensure (in so far as it is able) that the provisions of this Agreement are complied with;

(c)     at all times during the continuance of this Agreement, to fully and punctually perform, enforce and comply with all obligations on its part under the Member Agreements and any policies agreed by the Board from time to time;

(d)     promote the best interests of the Company and to realize the maximization of long-term benefits of the Members with respect to their interest in the Company;

(e)     keep confidential all of the Company's confidential and sensitive information; and

(f)     not intentionally take any action that could reasonably be expected to prejudice the Company or any other Member.

Section 5.3     Meetings of the Members.

(a)     Any Class A Member may call for a meeting of the Members. All meetings of the Members shall be held telephonically or at the principal office of the Company or at such other place within or without the State of New York as may be determined by the Class A Members and set forth in the respective notice or waivers of notice of such meeting. Any Member may participate in any meeting telephonically regardless of whether the meeting is by telephone or in person. A record shall be maintained by the Company of each meeting of the Members. All meetings and calls shall be held during any time period that is during business hours in both New York and London, unless all Class A Members agree otherwise.

(b)     Written or printed notice stating the place, day and hour of the meeting shall be delivered to all Members (with a copy to the Company), by or at the direction of the Member(s) calling the meeting, not less than seven days prior to the date of the meeting. Unless all the Class A Members agree, such notice shall specify the purpose or purposes of such meeting and no other business (other than miscellaneous 'housekeeping' matters) may be conducted at such meeting unless it has been stated in the notice. The notice shall also enclose briefing papers sufficient to enable each Member to be fully informed in relation to each proposed agenda item, issue and resolution, in addition to copies of all materials that will be considered or referred to in the meeting and voting sheets to be used by the Class A Members in the meeting.

(c)     Except as otherwise provided herein or by applicable law, at any time, all (100 percent) of the Class A Members, represented in person or by proxy, shall constitute a quorum of Members for purposes of conducting business, provided that, if within 30 minutes from the time appointed for the meeting a quorum is not present, the meeting shall be adjourned to the same day the following week at the same time and place. If at such adjourned meeting a quorum of at least 100 percent is also not present within 30 minutes of the appointed time it shall likewise be adjourned in the same manner to the following week. If at such third further adjourned meeting a quorum is not present within 30 minutes of the appointed time, then notwithstanding the above referred to quorum, the meeting shall commence and the business for the meeting shall be validly transacted regardless of the number of Members or the percentage of voting Units accounted for by the participating Members. Once a quorum is present at the meeting of the Members, the subsequent withdrawal from the meeting of any Member before adjournment or the refusal of any Member to vote shall not affect the presence of a quorum at the meeting. Other than as required by law, all other resolutions shall be passed by a majority of the votes cast.

Notwithstanding the foregoing Member approval requirement to the contrary, as further provided in Section 4.6, the matters set out in Exhibit B require the approval of all of the Directors, except that at all times during the Manresa Approval Period, only the affirmative vote of the two Directors appointed by Manresa shall be required for the matters listed in Part A of Exhibit B.

(d)     Except as otherwise required herein or by applicable law, any action to be taken at a meeting of the Members may be taken without a meeting if a consent or consents in writing, setting forth the action so taken, shall be signed by such Class A Members whose approval is required for such action and such consent or consents are delivered to the Company. A record shall be maintained by the Company of each such action taken by written consent of the Members.

(e)     Each Class A Member shall be entitled to a vote equal to its Percentage Interest.

(f)     In the case of any matter submitted to the Class A Members for approval, each Member shall grant or deny its approval as soon as reasonably practical, but in no event later than ten business days after its actual receipt of all of the materials to be approved along with such other additional information that such Member may reasonably request in connection therewith or that is otherwise reasonably necessary to make an informed decision on the request for approval (collectively, the "*Information*"), or such consent or approval shall be deemed given; provided, however, the ten business day period shall commence only upon such Member's receipt of all of the Information along with a written notice that includes the following statement, in capitalized letters "PURSUANT TO SECTION 5.3 OF THE OPERATING AGREEMENT, YOU HAVE TEN BUSINESS DAYS FROM THE LATER OF YOUR RECEIPT OF (I) THIS LETTER, AND (II) ALL OF THE ITEMS OF INFORMATION REQUIRED UNDER SAID SECTION, TO GRANT OR DENY THE REQUEST FOR APPROVAL CONTAINED IN THIS NOTICE OR SUCH CONSENT SHALL BE DEEMED TO HAVE BEEN GRANTED BY YOU."

Section 5.4    Limitation of Liability. No Member will (a) be obligated personally for any debt, obligation or liability of the Company or of any other Member by reason of being a Member, whether arising in contract, tort or otherwise, and (b) have any fiduciary or other duty to another Member with respect to the business and affairs of the Company. No Member will have any responsibility to restore any negative balance in his or her Capital Account or to contribute to or in respect of the liabilities or obligations of the Company or return distributions made by the Company except as required by the Act or other applicable law.

Section 5.5    Authority. No Member, in his or its capacity as a Member, shall have the power to act for, or on behalf of, or to bind, the Company.

Section 5.6    Partition. Each Member waives, until termination of the Company, any and all rights that it may have to maintain an action for partition of the Company's property.

Section 5.7    Resignation of Members. Except in connection with a Permitted Transfer of all of its Units in accordance with Section 13.2(a), a Member may not resign from the Company without the written consent of the Board.

Section 5.8     Conflicting Interest. It is specifically understood and agreed to by each of the Members that each Member and its Affiliates currently, and may in the future, have Conflicting Interests. Except as provided in Section 5.8(b), under no circumstances will a Conflicting Interest be considered to be a violation of any provision of this Agreement, so long as: (i) each Member promptly discloses to the other Members the existence of any such Conflicting Interest, and updates the other Members to the extent the scope of the existence of such Conflicting Interest materially changes; provided, however, that nothing in this Agreement shall require a Member to disclose any information relating to a Conflicting Interest that is subject to any confidentiality obligation of such Member; (ii) each Member ensures that no confidential information concerning the Property is used or disseminated in relation to a Conflicting Interest in a manner which is calculated to or is likely to materially and adversely affect the financial prospects of the Property and/or confer a competitive advantage in relation to such Conflicting Interest; (iii) in the case of JSMB, JSMB ensures that the services provided under the Development Management Agreement and the Property Management Agreement are not adversely affected as a direct or indirect result of any of its Conflicting Interests; and (iv) in the case of CRE, CRE ensures that the services provided under the Entitlements Agreement are not adversely affected as a direct or indirect result of any of its Conflicting Interests.

Section 5.9     Conflicting Interest ROFO. Notwithstanding any provision hereof to the contrary, CRE shall not undertake any activity that would constitute a Conflicting Interest anywhere in the CRE Restricted Area prior to the earlier of (x) the Entitlements Date or (y) in the event of a Project Suspension, the Suspended Entitlements Date (except that if the Company resumes the Project within six months after the date of Project Suspension, then this clause (y) shall no longer apply unless the Suspended Entitlements Date has theretofore occurred); provided, however, that CRE may undertake an Entitled Conflicting Interest so long as it first complies with the provisions of this Section 5.9.

(a)     Notice. In the event CRE or any of its Affiliates proposes to become engaged in a Conflicting Interest, then CRE shall first deliver a written notice to the Class A Members, which notice shall include the principal business terms and conditions of the proposed transaction related to the Conflicting Interest (for example, if the proposed transaction related to the Conflicting Interest is the purchase of a site, the notice shall include, among other things, the proposed purchase and sale agreement, the purchase price, the principal due diligence materials provided to the date of such notice, and the amount CRE proposes to invest on its own behalf) (herein, the "*Conflicting Interest Deal Terms*").

(b)     Acceptance. Within 30 days after receipt of such written notice, any one or more Class A Members (in proportion to their Units or as they may otherwise agree) may agree to participate in such Conflicting Interest opportunity on the Conflicting Interest Deal Terms but, as among the Members, on substantially the terms and conditions of this Agreement (adjusted to reflect the amount CRE proposes to invest on its own behalf and/or is entitled to receive under the Conflicting Interest Deal Terms in exchange for the provision of services).

(c)     Failure to Accept. If, within such 30-day period, no Class A Member has agreed to participate in such Conflicting Interest opportunity on the Conflicting Interest Deal Terms, then CRE may proceed with the Conflicting Interest opportunity, so long as it does so on business terms and conditions that are substantially the same as (and have substantially the same

net economic equivalence as) the Conflicting Interest Deal Terms. If CRE does not consummate the proposed Conflicting Interest opportunity within 180 days after the expiration of the Class A Member's 30-day response period, or if the Conflicting Interest Deal Terms are revised materially (for illustration purposes, a reduction in the purchase price of five percent or more would be a material revision), then such Conflicting Interest opportunity shall again be subject to the provisions of this Section.

(d)  Structure. If the Class A Members agree to participate in such Conflicting Interest opportunity in accordance with clause (b) above, the Board may cause the Company to be the participant in such Conflicting Interest opportunity or create another entity (including a Property Co) or create another form of ownership in order to participate in such Conflicting Interest opportunity.

Section 5.10  Amendments. Any amendment to this Agreement shall be adopted and be effective as an amendment hereto only if it receives the approval of the Directors; *provided, however,* that no such amendment shall (a)(i) change the purpose of the Company from that set forth in Section 3.1, (ii) alter the Capital Account of any Member or Economic Interest Owner, (iii) change the allocation provisions of Article 8 hereof, (iv) alter the respective interests of the Members and Economic Interest Owners, if any, in distributions made by the Company except as otherwise provided in Article 4, (v) increase the liabilities of any Covered Person beyond those provided for in Section 12.1, (vi) cause the Company to cease to qualify as a limited liability company under the Act, (vii) require any Member to make any Capital Contribution in excess of its Capital Commitment; (viii) amend Section 6.4 or Exhibit B, or (ix) amend this Section 5.10 to delete or alter any of clauses (a)(i) through (ix), in each case without the consent of any Member (including a Class B Member or a Class C Member) adversely affected thereby and, in the case of an amendment described in clause (i), (vi), (vii), (viii) or (ix), without the consent of all of the Members (including the Class B Member and the Class C Member).

ARTICLE 6
MANAGEMENT AND CONTROL OF COMPANY

Section 6.1  Appointment of Board of Directors; Meetings.

(a)  Appointment of Board of Directors. The business and affairs of the Company shall be overseen by a Board of Directors (the "*Board*") in accordance with this Article 6. The Directors need not be residents of the State of New York. The number of Directors shall be three, and shall be appointed by the Members as follows:

(i)  Manresa shall be entitled to appoint two Directors (each a "*Manresa Director*") and to remove such Persons and to replace them, and hereby appoints Seth Schumer and Oleg Pavlov as its initial Directors of the Company; and

(ii)  JSMB shall be entitled to appoint one Director (each a "*JSMB Director*"), and to remove that person and to replace him, and hereby appoints Matthew Baron as its initial Director of the Company.

CRE shall be entitled to appoint one Observer (the "*CRE Observer*"), and to remove that person and to replace him, and hereby appoints Brent Carrier as its initial Observer.

(b)     Breach.  Notwithstanding a Member's right to appoint a Director or Observer under the provisions of this Section 6.1, any breach by such Director or Observer of the provisions of this Agreement shall entitle the Members to remove such person (provided that, if the breach is capable of being remedied, the Director or Observer has been given a reasonable opportunity to do so) and the applicable Member shall have the right to appoint a replacement in accordance with the nomination of JSMB (in the case of the removal of the JSMB Director), CRE (in the case of the removal of the CRE Observer) or Manresa (in the case of the removal of a Manresa Director).  In the event that a nominated Director or Observer is removed and such removal results in legal action against the Company by the Person being removed, the Member who appointed that Director or Observer shall indemnify the Company from any losses (including legal fees and expenses) suffered as a result of such legal action.

(c)     Term of Office.  Each Director and Observer shall remain in office until the earlier of his or her removal by the Member that appointed him or her, death, or resignation.  In the event a Director or Observer dies, is unwilling or unable to serve as such, due to a disability or otherwise, or is removed from office, the Member who appointed such Director or Observer shall promptly designate a successor to such Director or Observer.

(d)     Voting.  Each Director shall be entitled to one vote on any matter on which the Board is entitled to vote.  No Observer shall have any voting or approval rights, and any reference in this Agreement to the act, action or approval of the Board (or words or phrases of similar import) shall refer only to the act, action or approval of the required number (or votes) of the Directors.

(e)     Meetings.  The Board shall meet at such time and at such place as the Directors may designate.  The Board shall meet not less than one time in any 12 month period.  A record shall be maintained by the Company of each meeting of the Board.  All meetings and calls shall be held during any time period that is during business hours in both New York and London, unless all Directors agree otherwise.

(i)     Any meeting of the Board may be held in person or telephonically.  Any Director or Observer may participate in any Board meeting by telephone regardless of whether the meeting is held in person or telephonically.  Written or printed notice stating the place, day and hour of the meeting, together with all relevant information and supporting information, shall be delivered to all Directors and Observers, with a copy to the Manresa Representative and the Company, not less than five Business Days prior to the date of the meeting, by or at the direction of the Directors calling the meeting.  Unless all the Directors agree, such notice shall specify the purpose or purposes of such meeting and no other business (other than miscellaneous "housekeeping" matters) may be conducted at such meeting unless it has been stated in the notice.  The notice shall also enclose briefing papers sufficient to enable each Director and Observer to be fully informed in relation to each proposed agenda item, issue and resolution, in addition to copies of all materials that will be considered or referred to in the meeting and voting sheets to be used by the Directors in the meeting.

(ii)    The presence of all of the Directors shall constitute a quorum of the Board for purposes of conducting business, provided that, if within 30 minutes from the time appointed for the meeting a quorum is not present, the meeting shall be adjourned to the same day the

following week at the same time and place. If at such adjourned meeting a quorum is also not present within 30 minutes of the appointed time, it shall likewise be adjourned in the same manner to the following week. If at such third further adjourned meeting a quorum is not present within 30 minutes of the appointed time, the meeting shall commence and the business for the meeting shall be validly transacted (subject to Section 6.4 and other provisions hereof that specify approval or voting thresholds), provided that there are at least two Directors present which shall be deemed to constitute a quorum. A Director may vote or be present at a meeting either in person, by phone or by proxy.

(iii)     Attendance of a Director at any meeting shall constitute a waiver of notice of such meeting, except where a Director attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(iv)     Notwithstanding any provision contained in this Agreement, any action of the Board (including under Section 6.4) may be taken by written consent by or on behalf of the Directors without a meeting. Any such action taken by the Board without a meeting shall be effective only if the written consent or consents are in writing, set forth the action so taken, and are signed by the Directors whose approval is required for such action and such consent or consents are delivered to the Company.

(f)     <u>Deemed Approval</u>. In the case of any matter submitted to a Director for approval, each Director shall grant or deny its approval as soon as reasonably practical, but in no event later than ten business days after its actual receipt of all of the Information that such Director may reasonably request in connection therewith or that is otherwise reasonably necessary to make an informed decision on the request for approval, or such consent or approval shall be deemed given; provided, however, the ten business day period shall commence only upon such Director's receipt of all of the Information along with a written notice that includes the following statement, in capitalized letters "PURSUANT TO SECTION 6.1 OF THE OPERATING AGREEMENT, YOU HAVE TEN BUSINESS DAYS FROM THE LATER OF YOUR RECEIPT OF (I) THIS LETTER, AND (II) ALL OF THE ITEMS OF INFORMATION REQUIRED UNDER SAID SECTION, TO GRANT OR DENY THE REQUEST FOR APPROVAL CONTAINED IN THIS NOTICE OR SUCH CONSENT SHALL BE DEEMED TO HAVE BEEN GRANTED BY YOU."

Section 6.2     <u>Operating Member</u>.

(a)     Except as expressly provided otherwise in this Agreement (including Section 6.4), the day-to-day business and affairs of the Company shall be managed by an operating member (the "*Operating Member*"), who shall be appointed by the Directors. The Members hereby designate JSMB to be the initial Operating Member of the Company, and JSMB hereby accepts and agrees to be bound by the terms and conditions of this Agreement. JSMB shall continue as Operating Member until it sooner resigns or is removed by the Directors or the Class A Members. The Operating Member shall have the right and the duty to manage the day-to-day business and affairs of the Company and to implement the decisions made on behalf of the Company by the Board in accordance with the terms of this Agreement and applicable laws and regulations, and such other rights and powers as are granted to the Operating Member hereunder

and as the Board may from time to time expressly delegate to the Operating Member. The Operating Member agrees that it shall devote the necessary time and effort to the Company and its business for the purpose of conducting the business of the Company and carrying out the Operating Member's responsibilities as set forth herein in a prudent manner and that any breach of the obligation set forth in this sentence shall be deemed a material breach of this Agreement. Notwithstanding the foregoing, it is specifically understood and agreed that the Operating Member and its members, managers, officers and directors and their affiliates shall not be required to devote full time to fulfilling the Operating Member's obligations hereunder.

Without limiting the generality of the foregoing but subject to Section 6.4 hereof, the Operating Member shall, without requiring any further approval of the Board, have the right and the duty to use commercially reasonable efforts to do, accomplish and complete using (and subject to the availability of) the Company's funds, for and on behalf of the Company with reasonable diligence and in a prompt and businesslike manner, exercising such care and skill as a prudent owner with sophistication and experience in owning, operating and managing properties like the Property would exercise in dealing with its own property, all of the following:

(i)     Cause to be maintained adequate records and accounts of all Company operations and expenditures and furnish the Members with (A) such reports of operations of the Property as are received from time to time; and (B) annual reports as of the end of each fiscal year containing a statement of Company operations for, and balance sheet of, the Company as of the end of such fiscal year.

(ii)     Make available to any Member, at such Member's own expense and upon reasonable written demand, during normal business hours and at the principal place of business of the Company, all books and records of the Company required to be maintained, true and full information regarding the state of the business and financial condition of the Company, and such other information regarding the affairs of the Company as is just and reasonable.

(iii)     Use its commercially reasonable efforts to manage the business and affairs of the Company and devote such part of its time as may be reasonably necessary to manage the operations of the Company as contemplated under the Agreement.

(iv)     Execute, attend upon and perform of all obligations and undertakings by the Company under the documents evidencing and securing it loans and other agreements binding upon it.

(v)     Implement the Annual Plan.

(vi)     Protect and preserve the title and interest of the Company in and with respect to assets owned by the Company.

(vii)     Obtain all necessary permits, zoning variances or changes, and other governmental approvals required in connection with the operation of the Company's business.

(viii)   Supervise, control and direct all construction and other development activities of the Company.

(ix)     Cause to be prepared and delivered to the Members reports (with back-up documentation) as required by this Agreement, and hold meetings at the Members' reasonable request (and provide the Members with notice of all meetings), which meetings are intended to provide the Members with information relating to the financial status of the Company and its operations.

(x)     Retain, employ, terminate and coordinate, as the case may be, the services of, all agents, employees, architects, contractors, subcontractors, supervisors, engineers, attorneys, accountants and other individuals and entities to carry out the business purpose of the Company.

(xi)     Pay promptly when the same come due, all ad valorem taxes, assessments, real estate taxes and all other debts and obligations of the Company due in connection with any of the operations of the Company, including debt service (principal and interest) on its loans. Notwithstanding the foregoing, the Operating Member shall have the right to defer any such payments, with the exception of any payments due, so long as the Operating Member shall diligently and in good faith contest the same in a manner that shall have the effect of preventing the sale or forfeiture of Company property or any part thereof, or any interest therein.

(xii)     Maintain all funds of the Company in an account in a major metropolitan bank or banks.

(xiii)     Perform other normal business functions and otherwise operating and managing the business and affairs of the Company in accordance with and as limited by the terms of the Agreement.

(xiv)     Perform all other duties and conducting all other business affairs of the Company which do not require approval of the Members.

(b)     The Operating Member shall not (and shall not have any right, power or authority to), without the prior written approval of the Board, bind or take any action on behalf of or in the name of the Company, or enter into any commitment or obligation binding upon the Company, except for (i) actions authorized under this Agreement and (ii) actions authorized by the Board in the manner set forth herein.

(c)     Notwithstanding anything herein to the contrary, Manresa shall act as the Operating Member instead of JSMB with respect to the negotiation, execution, amendment, modification, or termination of, or the exercise or waiver of any rights of the Company pursuant to, the Development Management Agreement and the Property Management Agreement.

Section 6.3     Officers.  The Board, by written instrument signed by it, shall also have the power to appoint agents to act for the Company with such titles as the person or entity making the appointment deems appropriate and to delegate to such agents such of the powers as the Board may determine. The agents so appointed may include persons holdings titles such as Chief Executive Officer, President, Secretary, Vice-Presidents, and/or other officers to manage the day to day affairs of the Company (each, an "*Officer*"), and may further retain such additional Persons as the Board deems advisable to assist or advise them in the management and operation of the Company.  Unless the authority of the agent designated as the officer in question

is limited in the document appointing such officer, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of an New York corporation would have to act for a New York corporation in the absence of a specific delegation of authority, subject to Section 6.4 and Exhibit B hereof.

Section 6.4    Approval Requirements.  In recognition that the Operating Member will be responsible for the day-to-day business and affairs of the Company, the Members agree that the matters listed in Exhibit B shall be referred to the Board for prior approval at its next meeting or, in the absence of a Board meeting, shall be referred to the Board for its prior approval in writing (which may for these purposes include notices and approvals by electronic mail).  All matters referred to the Board must be approved by all of the Directors, except that at all times during the Manresa Approval Period, only the affirmative vote of the two Directors appointed by Manresa shall be required for the matters listed in Part A of Exhibit B.  Notwithstanding any approval rights of JSMB herein to the contrary, if the Class A Percentage Interest of JSMB drops below 3.5 percent, JSMB and the Director appointed by JSMB shall lose all voting rights except for (a) the right to approve amendments to this Agreement in accordance with Section 5.10 hereof, and (b) the right to approve a Member Agreement between the Company, on one hand, and Manresa or any of its Affiliates, on the other hand, in accordance with Section (h) of Part A of Exhibit B.

Section 6.5    Special Duties of the Board.

(a)    The Board shall not permit the Company to have any employees.

(b)    The Board shall not permit to be diverted to any other Person sources of revenue properly belonging to the Company.

(c)    Each Director shall be required to disclose to the Board any conflict of interest or potential conflict of interest in relation to any matter being considered by the Board.

Section 6.6    Director Compensation.  Directors shall not be compensated for their services as Directors.

Section 6.7    Development Management Agreement; Property Management Agreement; Entitlements Agreement; Member Fees.

(a)    The Company shall enter into (i) the Development Management Agreement with the Development Manager in substantially the form set out in Exhibit H, with such changes as may be acceptable to Company and the Development Manager, (ii) the Property Management Agreement with the Property Manager in substantially the form set out in Exhibit I, with such changes as may be acceptable to Company and the Property Manager), and (iii) the Entitlements Agreement in respect of the Entitlements with CRE or an Affiliate of CRE in substantially the form set out in Exhibit J, with such changes as may be acceptable to Company and CRE.  The Member Fees payable to (x) the Development Manager under the Development Management Agreement, (y) the Property Manager under the Property Management Agreement, and (z) CRE or an Affiliate of CRE under the Entitlements Agreement are described in Exhibit D.

(b)     Each Co-Development Manager shall enter into a Joinder to the Development Management Agreement, which shall provide it with the right to act as co-development manager with the Development Manager under the Development Management Agreement so long as it does not interfere unreasonably with the Development Manager's performance of its duties thereunder. This right shall include the right to (i) use the title "Co-Development Manager" in relation to the Project, (ii) attend all meetings held or attended by the Development Manager in its role as such, and (iii) receive copies of all documents, plans, budgets, and reports prepared by or delivered to Development Manager, but shall not grant a Co-Development Manager (or any of its Affiliates) any additional rights under this Agreement. The Member Fees payable to the Cube Co-Development Manager under its joinder to the Development Management Agreement are described in Exhibit D. The CRE Co-Development Manager shall not be entitled to any fee or expense reimbursement.

(c)     Exhibit D also sets forth other Member Fees that the Company will pay to the Members or their Affiliates, subject to the terms and conditions of the applicable Member Agreement and/or Exhibit D.

Section 6.8     Company Expenses. Subject to (i) the provisions of Article 4, (ii) the Development Budget, and (iii) any applicable Annual Budget, the Company shall be responsible for paying, and shall pay, all direct costs and expenses related to the business of the Company and of acquiring, holding, owning, developing, servicing, collecting upon and operating the Property. In the event any such costs and expenses are or have been paid by the Operating Member, then subject to the provisions of Article 4, the Operating Member shall be entitled to seek reimbursement for such payment so long as such payment is contemplated by the Development Budget or the Annual Budget or is expressly authorized in this Agreement or has been agreed in advance by Manresa.

Section 6.9     Offices. The Company expects to maintain an office at the Property prior to receipt of the Entitlements, which Members (and their Affiliates that provide services under a Member Agreement) may use until the Board determines that such office is no longer necessary for Company business. No Member shall acquire (and each Member hereby waives) any tenancy or other possessory right by virtue of its use of the Company's office space.

Section 6.10     Brownfield Tax Credits. The Company (on its own behalf or through a wholly-owned Property Co) shall become a party to the Brownfield Cleanup Agreement with respect to the Site in order to be admitted into the Brownfield Cleanup Program. The Company (on its own behalf or through a wholly-owned Property Co) shall apply, or cause CRE or the Affiliate of CRE under the Entitlements Agreement to apply, for Brownfield Tax Credits in connection with certain site preparation and cleanup, groundwater remediation, and tangible property development costs related to the Project.

## ARTICLE 7
## DEADLOCK; DISPUTE RESOLUTION

Section 7.1    Deadlock. If the Directors are unable to agree a proposal or resolution that requires the approval of all of the Directors and such approval is not achieved (a "*Deadlock*"), a Director may serve on the other Directors a notice (a "*Deadlock Notice*") specifying the matter in dispute (the "*Disputed Matter*"). Promptly following the issuance of a Deadlock Notice, the Directors shall set a date, being no later than 20 days from the date on which the Deadlock Notice was issued, for a meeting, at which the Disputed Matter shall be considered. If at the meeting, the Directors have still not been able to pass a resolution or reach an agreement regarding the Disputed Matter, then the Members shall procure that their respective most senior executives promptly meet and use their best efforts in good faith to resolve as soon as possible the Disputed Matter. If, on the date that is 25 days following the date on which the Members' respective most senior executives first meet pursuant to this section, the Disputed Matter remains unresolved, any Member may serve on the other Members a written notice referring the parties to a non-binding mediation process under the auspices of the American Arbitration Association, such process to take place in New York, New York, with a mediator jointly selected by the Members, and with expenses of the mediator borne equally by the Members. All Members shall participate in the mediation process in good faith.

In addition, a Deadlock is a Buy-Sell Event, which entitles the Members to exercise their rights pursuant to Article 15.

Section 7.2    Dispute Resolution. If a dispute arises in connection with this Agreement other than a dispute to which Section 7.1 applies, the Members agree to use commercially reasonable efforts to settle such disputes by good faith negotiation. If the Members are unable to resolve any such dispute within 30 days after commencing discussions to resolve such dispute, then the matter shall be resolved in accordance with the provisions set forth below.

Except for seeking relief from a court of competent jurisdiction for the issuance of an injunction or other form of emergency relief, the Members agree that any disputes which may arise out of or in connection with this Agreement shall be decided by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, in each case, as then currently in effect. The demand for arbitration shall be filed in writing with the American Arbitration Association in New York, New York within a reasonable time after the dispute has arisen.

Each party (i.e., (i) Manresa on the one hand and (ii) the other Member(s) (or JSMB, if JSMB and CRE are acting jointly) on the other) to the dispute shall select one arbitrator and the two arbitrators so selected shall select a third arbitrator. If the two selected arbitrators are unable to agree on the selection of a third arbitrator, the issue shall be resolved by submitting the matter to a court of competent jurisdiction. All arbitrators shall be individuals with significant experience (x) in connection with a dispute relating to construction phase of the Project, in the residential real estate construction industry in New York City, or (y) in connection with a dispute relating to the operation of the Project following the construction phase, in the residential rental apartment industry in New York City.

The award of the arbitrators shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction.

The agreement of the parties to arbitrate all disputes may be specifically enforced by any court having jurisdiction.

Each party to such arbitration shall pay its own attorney's fees and expenses incurred in connection with the arbitration and the expense of any witness produced by it, unless otherwise determined by the arbitrators. The cost of any stenographic record and all transcripts thereof shall be prorated equally among the parties ordering copies and shall be paid by such parties directly to the reporting agency.

Any and all other expenses of the arbitration, including but not limited to required travel expenses, fees of the arbitrators' the expenses of any witness or the cost of any evidence produced at the request of the arbitrators, shall be borne as determined by the arbitrators.

ARTICLE 8
ALLOCATIONS

Section 8.1    Allocations. The net amount of Profits or Losses for a period shall be allocated among the Members and Economic Interest Owners in such manner that, as of the end of such period, the Capital Account balance of each Member and Economic Interest Owner equals, or is as close as possible to, the Target Capital Account Balance of such Member and Economic Interest Owner. Except as otherwise provided in this Agreement, for Federal income tax purposes, all items of Company income, gain, loss, deduction, basis, amount realized and credit, and the character and source of such items, shall be allocated among the Members and Economic Interest Owners in the same manner as the corresponding items of income, gain, loss, deduction or credit are allocated to Capital Accounts. The Company shall maintain such books, records and accounts as are necessary to make such allocations.

Section 8.2    Other Allocation Rules.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Board using any permissible method under Code Section 706 and the Treasury Regulations thereunder.

(b)     If the Company makes any expenditures qualifying for Brownfield Tax Credits, then one-half of such qualifying expenditures and the related Brownfield Tax Credits shall be allocated among the Class A Members, *pro rata* in accordance with their respective Class A Units, and the other half of such expenditures and the related Brownfield Tax Credits shall be allocated to the Class B Member. The Members believe that any such allocation is in accordance with the respective interests of the Members in the Company in accordance with Treasury Regulations Section 1.704-1(b)(4)(ii).

(c)     The Members are aware of the income tax consequences of the allocations made by this Article 8 and hereby agree to be bound by the provisions of this Article in reporting their shares of Company income and loss for income tax purposes.

(d)     The provisions of this Agreement relating to the allocation of Profits and Losses are intended to comply with Treasury Regulations under Section 704(b) of the Code and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(e)     If one or more Units are Transferred to a Permitted Transferee during any Fiscal Year of the Company, the Profits or Losses attributable to such Unit(s) for such Fiscal Year shall be allocated between the transferor and the transferee in any manner permitted by Section 706(d) of the Code and the Treasury Regulations thereunder upon which they shall agree; *provided, however*, that if the Company does not receive on or before January 31 of the year following the year in which the Transfer occurs written notice stating the manner in which such parties have agreed to allocate such Profits or Losses, such Profits or Losses shall be allocated between the transferor and transferee as determined by the Board in accordance with Code Section 706(d) and the Treasury Regulations thereunder.

ARTICLE 9
DISTRIBUTIONS

Section 9.1     <u>Distributions</u>.  The Board shall review the Company's accounts at the end of each Fiscal Quarter to determine if distributions are appropriate.  The Board shall cause Net Cash Flow and Capital Transaction Proceeds exceeding the Reserve Amount to be distributed to the Members and Economic Interest Owners, unless all the Directors agree otherwise (having regard to the Annual Plan and any contingent liabilities).  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to make a distribution to the Members or Economic Interest Owners on account of their interest in the Company if such distribution would violate the Loan Documents or any provision of the Act or any other applicable law.  Subject to Sections 9.1(a) and (b), distributions to the Members of Net Cash Flow and Capital Transaction Proceeds shall be made in the order and priority set forth in this Section 9.1 and <u>Exhibit C</u>, which may or may not be based upon the Members' respective Units, Percentage Interests, Capital Contributions, or Capital Accounts.

(a)     Notwithstanding any provision of this Agreement or <u>Exhibit C</u> to the contrary, in the event JSMB or any of its Affiliates (i) commits or causes the Company to commit a material breach under a Major Agreement or materially breaches or violates this Agreement or a Member Agreement or its duties hereunder or thereunder, and such breach or violation (A) arises from its intentional act, fraud or willful misconduct (as agreed or settled among the parties to such Major Agreement or among the Class A Members or as finally determined by a court or arbitration (all appeals having been exhausted or expired)), and (B) is not fully remedied by the earlier of (x) 20 Business Days after JSMB is notified of such breach or violation (or if such breach is not, despite diligence, reasonably capable of being remedied within such 20 Business Day period, then such additional time, not to exceed an additional 20 Business Days, as may be necessary, with diligence, to remedy such breach, or (y) the expiration of the notice and cure period for such breach or default set forth in such Member Agreement or (z) the date the counterparty to the applicable Major Agreement in question shall have commenced the exercise of its remedies under such Major Agreements, or (ii) seeks to partition the Company's or any Property Co's assets, or appoint a receiver for or apply for judicial dissolution of the Company or any Property Co, or (iii) files or consents or acquiesces in the filing of any petition for bankruptcy, reorganization or arrangement concerning the Company or any Property Co pursuant to federal

connection with obtaining the Entitlements and the Brownfields Tax Credits. This Section shall survive termination of this Agreement.

\*     \*     \*     \*     \*

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLASS A MEMBERS:

MANRESA LIMITED,
a Cayman Islands limited company

By:_____
    Name:_____
    Title:_____

JSMB 4540 LLC,
a New York limited liability company

By:   JSMB 4540 MM LLC,
      a New York limited liability company,
      its Managing Member

By:_____
    Name:_____
    Title:_____

CLASS B MEMBER:

VERNON 4540 REALTY, LLC,
a Delaware limited liability company

By:_____
    Name:_____
    Title:_____

CLASS C MEMBER:

JSMB 4540 MM LLC,
a New York limited liability company

By:_____
    Name:_____
    Title:_____

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLASS A MEMBERS:

MANRESA LIMITED,
a Cayman Islands limited company

By:_____
    Name:_____
    Title:_____

JSMB 4540 LLC,
a New York limited liability company

By:   JSMB 4540 MM LLC,
     a New York limited liability company,
     its Managing Member

By:_____
    Name:  Matthew Baron
    Title:  Authorized Signatory

CLASS B MEMBER:

VERNON 4540 REALTY, LLC,
a Delaware limited liability company

By:_____
    Name:_____
    Title:_____

CLASS C MEMBER:

JSMB 4540 MM LLC,
a New York limited liability company

By:_____
    Name:  Matthew Baron
    Title:  Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLASS A MEMBERS:

MANRESA LIMITED,
a Cayman Islands limited company

By:_____
    Name:_____
    Title:_____

JSMB 4540 LLC,
a New York limited liability company

By:  JSMB 4540 MM LLC,
    a New York limited liability company,
    its Managing Member

By:_____
    Name:_____
    Title:_____

CLASS B MEMBER:

VERNON 4540 REALTY, LLC,
a Delaware limited liability company

By:_____
    Name: Brent L. Carrier
    Title: Authorized Signatory

CLASS C MEMBER:

JSMB 4540 MM LLC,
a New York limited liability company

By:_____
    Name:_____
    Title:_____

# EXHIBIT 2

# AMENDMENT TO

# AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# VERNON 4540 REALTY LLC

This Amendment (this "Amendment") to the Amended and Restated Operating Agreement, dated July 21, 2011 (the "Operating Agreement") of Vernon 4540 Realty LLC, a Delaware limited liability company (the "Company"), is entered into as of November 14, 2013, by and among the Company, CRE Vernon Member LLC, a Delaware limited liability company ("CRE"), and Brent L. Carrier ("Carrier" and together with CRE, the "Members"). Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to such terms in the Operating Agreement.

**WHEREAS**, the Company has been formed as a limited liability company under the Delaware Limited Liability Company Act, as amended from time to time (the "Act"); and

**WHEREAS**, the Company and the Members propose entering into a series of transactions consisting of (1) the Companies acceptance of a bridge loan (the "Bridge Loan") in the sum of approximately $6,930,000.00 secured by, among other things, a mortgage securing the real property owned by the Company, a pledge by the Members of the Member's interest in the Company, and a personal guaranty by Carrier of the Bridge Loan; (2) the purchase by Carrier of the membership interests of NW Vernon Development LLC in and to the Company (the "NW Interests"); (3) the specific allocation of all NYS DEC Brownfield Tax Credits related to BCP SITE C241108 solely to Carrier; (4) the Company's entering into certain customary loan documents in connection with the Bridge Loan and certain other agreements and undertakings (collectively, the "Bridge Loan Financing"); and (5) the Companies business joint venture with certain principals directly affiliated to the Bridge Loan lender ("Manresa") (the foregoing transactions and any other transactions related or incidental thereto are herein referred to as the "Recapitalization"); and

**WHEREAS**, in order to permit the Recapitalization, the Members now desire to amend the Operating Agreement and to continue the Company as set forth herein and therein;

**NOW, THEREFORE**, the Members and the Company hereby enter into this Amendment to provide as follows:

1. Upon the consummation of the Recapitalization:

   (A) Carrier shall be paid the Class A Liquidation Preference, the Class A Preferred Return then due, the sole allocation of NYS DEC Brownfield Cleanup Program Tax Credits earned in conjunction with BCP Site #C241108 and

thereafter Carrier shall continue its own Units, subject to the adjustment hereinafter set forth, Carrier will be entitled to the Class A Liquidation Preference until such time as the Bridge Loan and all additional personal liabilities incurred by Carrier in his performance as the Manager of the Company; and

(B) CRE's interest in the Company shall be reduced to 500 Class B Units (50% of all Member Units), so that upon the consummation of the Recapitalization, Carrier shall own 50% of the Company and 100% of the BCP Tax Credits; and CRE shall own 50% of the Company.

2. Section 7(e) of the Operating Agreement shall be deleted in its entirety and, in lieu thereof, the following provisions shall be inserted:

"(e) Except for the rights specifically granted to CRE in this Agreement, Carrier will be the only Member of the Company with any voting or management rights. Each Member waives any and all rights that it may have to maintain an action for partition of the Company's property. The CRE and/or any Class B Member agrees to be a Member of the Company for the limited purposes provided herein; and the Class B Member and/or CRE agrees that CRE and each Class B Member will be a member of the Company solely for such limited purposes. CRE and each Class A Member agrees that, in accordance with Sections 18-301, 18-302 and 18-802, 18-803, 18-805 and other relevant provisions of the Delaware Act, in its capacity as the CRE Member and/or a Class B Member, (i) it will have no management, approval, voting, consent or veto rights in the Company, other than to the extent that its affirmative vote, approval or consent may expressly be required to amend this Agreement as provided in the next following sentences; and (ii) it will have no, and hereby waives any, right to seek the appointment of a receiver or apply for judicial dissolution of the Company. The CRE Member and no Class B Member, in its capacity as the CRE Member and/or the Class B Member, may bind the Company in any manner; provided, however, that the Company may not be dissolved or liquidated without the consent of all of the Members; provided, further, that no CRE Member (in contradiction to a guarantee by the Company itself) shall be required to guarantee any debts of the Company.

The Manager may amend this Agreement from time to time as it deems necessary or desirable in connection with the Company's purposes, including in connection with the addition of new Members or to effectuate the creation of additional and/or separate classes of Membership Interests, except that no amendment to this Agreement may be adopted or shall be effective as an amendment hereto that (a) alters the Capital Accounts of the Members; (b) changes the distribution and allocation provisions hereof; (c) increases the obligations or liabilities of a Member (provided, however, this shall not be deemed to be a limit on the Manager's right to increase the liabilities of the Company); (d) causes the Company to be treated for federal income tax purposes as an association taxable as a corporation rather than as a partnership; (e) causes the Company to cease to qualify as a limited liability company under the Delaware Act; (f) requires a Member to make any capital contribution; (g) is in contravention of or

inconsistent with this Agreement or other agreement to which the Company is a party; (h) would make it impossible to carry on the ordinary business of the Company; (i) materially changes the nature of the business or purpose of the Company; (j) amends Sections 12, 18, 23, 25, 26(e) (as amended by Paragraph 4 of this Agreement), 26(f); or (j) amends this Section 7(e), may be adopted or shall be effective as an amendment hereto without the written consent of all the Members that would be affected by such amendment."

3.      The following proviso shall be added after "Units" in Section 5(e) of the Operating Agreement:

"; provided, however, that upon the admission to the Company of any additional members who are allocated Membership Interests, the Membership Interests of all other Members shall be reduced accordingly on a *pro rata* basis; provided, further, the provisions of this Section 5(e) may not be amended without the consent of all Members."

4.      Section 18 of the Operating Agreement shall not be applicable to the Recapitalization.

5.      The period in the last sentence of Section 26(e) shall be removed and replaced with the following:

"; provided, however, that no distribution shall be made in connection with the Recapitalization and the transactions contemplated by this Amendment other than (x) the payment of the Class A Liquidation Preference and the Class A Preferred Return payable to Carrier; and (y) the payment of costs and expenses associated with the consummation of the Recapitalization, and as otherwise provided in this Agreement.

6.      Except as amended hereby, the Operating Agreement is hereby confirmed and shall continue to be, and shall remain, in full force and effect in accordance with its terms as currently written. The Members hereby agree to continue the Company as a limited liability company pursuant to the provisions of the Act. This Amendment may be executed in counterparts with all such counterparts, when taken together, being deemed to be a single agreement. This Agreement may be executed and/or evidenced in Portable Document Format (PDF), with all such PDF counterparts being deemed to be equivalent to original counterparts; and delivered via email.

7.      This Amendment shall be construed, interpreted and enforced in accordance with the internal laws and decisions of the State of Delaware.

*(balance of page intentionally left blank)*

IN WITNESS WHEREOF, the parties have duly executed this Amendment, or caused it to be duly executed, effective as of the date first set forth above.

COMPANY:

**VERNON 4540 REALTY LLC**

By: _____
Name: Brent L. Carrier
Title: Manager

**MEMBER:**

**BRENT L. CARRIER**

_____
Brent L. Carrier

**MEMBER:**

**CRE VERNON MEMBER LLC**

By: _____
Name: Brent L. Carrier
Title: Authorized Signatory

# EXHIBIT 3

# NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION

Division of Environmental Remediation, Office of the Director
625 Broadway, 12th Floor, Albany, New York 12233-7011
P: (518) 402-9706 I F: (518) 402-9020
www.dec.ny.gov

Brent Carrier
4540 Vernon Realty LLC
45 Carleon Ave.
Larchmont, NY 10538

DEC 15 2016

Matthew Baron
CSC 4540 Property Co., LLC
c/o Simon Development
230 Park Ave.
New York, NY 10169

Angela Krevey
Anable Beach, Inc.
375 South End Ave., Apt 6S
New York, NY 10280

Donald Rattner
549 46th Avenue LLC
116 Ferncliff Rd.
Cos Cob, CT 06807

> Re:  Certificate of Completion
>      Site No.: C241108
>      Site: Paragon Paint and Varnish Corp.
>      Long Island City, Queens County

Dear Applicants/Site Owner:

Congratulations on having satisfactorily completed the remedial program at the Paragon Paint and Varnish Corp Site. Enclosed please find an original, signed Certificate of Completion (COC). The New York State Department of Environmental Conservation (Department) is pleased to inform you that the Final Engineering Report is hereby approved, allowing the COC to be issued for the above-referenced site.

Please note that you are required to perform the following tasks:



- If you are the site owner, you must record a notice of the COC in the recording office for the County (or Counties) where any portion of the site is located within 30 days of issuance of the COC; or if you are a prospective purchaser of the site, you must record a notice of the COC within 30 days of the date that you acquire the site. A copy of the recorded notice should be provided to the Department's project manager. If you are a non-owner, you must work with the owner to assure the notice of COC is recorded within the time frame specified. A standard notice form is attached to this letter. Please return the proof of recording to:

> Chief, Site Control Section
> New York State Department of Environmental Conservation
> Division of Environmental Remediation
> 625 Broadway
> Albany, NY 12233-7020

- Provide the notice of the COC to the Document Repositories within 10 days of issuance of the COC. The Department will develop a fact sheet announcing the issuance of the COC and describing the institutional and engineering controls (IC/ECs), if any, that are required at the site and distribute it to the County Listserv within 10 days;

- Implement the Department-approved Site Management Plan (SMP) which details the activities necessary to assure the performance, effectiveness, and protectiveness of the remedial program; and you must report the results of these activities to the Department in a Periodic Review Report (PRR) which also includes any required IC/EC Certifications. The site IC/ECs are identified on the attached Site Management Form. The first PRR including the certification of the IC/ECs is due to the Department in April 2018.

If you have any questions regarding any of these items, please contact Sondra Martinkat at (718) 482-4891.

Sincerely,

Robert W. Schick, P.E.
Director
Division of Environmental Remediation

ec w/ enclosure:
K. Anders, J. Deming, A. Perretta – NYSDOH

ec w/o enc.:
S. Martinkat, J. O'Connell, R. Cozzy, G. Burke, K. Mintzer, K. Lewandowski, G. Heitzman – NYSDEC
O. Ramotar – Remedial Engineering, P.C. (oramotar@rouxinc.com)
M. Bogin – Sive, Paget & Riesel P.C. (mbogin@sprlaw.com)

# CERTIFICATE OF COMPLETION

**CERTIFICATE HOLDER(S):**

**Name**
549 46TH AVENUE LLC
Anable Beach, Inc.
Vernon 4540 Realty LLC

**Address**
11 Ferncliff Road, Cos Cob, CT 06807
375 South End Avenue, New York, NY 10280
45 Carleon Ave, Larchmont, NY 10538

**BROWNFIELD CLEANUP AGREEMENT:**

**Agreement Execution:** 9/4/08    **Agreement Index No.:** W2-1119-08-03

**Application Approval Amendment:** 8/17/10    **Agreement Execution Amendment:** 8/17/10

**Application Approval Amendment:** 7/21/11    **Agreement Execution Amendment:** 8/2/11

**SITE INFORMATION:**

**Site No.:** C241108   **Site Name:** Paragon Paint and Varnish Corp

**Site Owner:**   CSC 4540 Property Co, LLC

**Street Address:** 5-49 46th Avenue
**Municipality:** Long Island City    **County:** Queens **DEC Region:** 2
**Site Size:**  0.759 Acres
**Tax Map Identification Number(s):**    4-26-4
**Percentage of site located in an EnZone:**   0 - 49 %

A description of the property subject to this Certificate is attached as Exhibit A and a site survey is attached as Exhibit B.

**CERTIFICATE ISSUANCE**

This Certificate of Completion, hereinafter referred to as the "Certificate," is issued pursuant to Article 27, Title 14 of the New York State Environmental Conservation Law ("ECL").

This Certificate has been issued upon satisfaction of the Commissioner, following review by the Department of the final engineering report and data submitted pursuant to the Brownfield Site Cleanup Agreement, as well as any other relevant information regarding the Site, that the applicable remediation requirements set forth in the ECL have been or will be achieved in accordance with the time frames, if any, established in the remedial work plan.

The remedial program for the Site has achieved a cleanup level that would be consistent with the following categories of uses (actual site use is subject to local zoning requirements):

**Allowable Uses under the BCP:** Restricted-Residential, Commercial, and Industrial
**Cleanup Track:** Track 4: Restricted use with site-specific soil cleanup objectives

**Tax Credit Provisions for Entities Taxable Under Article 9, 9-A, 32, and 33:**
Site Preparation and On-Site Groundwater Remediation Credit Component Rate is 28 %.
Tangible Property Credit Component Rate is 12 %.

**Tax Credit Provisions for Entities Taxable Under Article 22 & S Corporations:**
Site Preparation and On-Site Groundwater Remediation Credit Component Rate is 28 %.
Tangible Property Credit Component Rate is 10 %.

The Remedial Program includes use restrictions or reliance on the long term employment of institutional or engineering controls which are contained in the approved Site Management Plan and an Environmental Easement granted pursuant to ECL Article 71, Title 36 which has been duly recorded in the Recording Office for Queens County as 2015000400038.

**LIABILITY LIMITATION**

Upon issuance of this Certificate of Completion, and subject to the terms and conditions set forth herein, the Certificate holder(s) shall be entitled to the liability limitation provided in ECL Section 27-1421. The liability limitation shall run with the land, extending to the Certificate holder's successors or assigns through acquisition of title to the Site and to a person who develops or otherwise occupies the Site, subject to certain limitations as set forth in ECL Section 27-1421. The liability limitation shall be subject to all rights reserved to the State by ECL Section 27-1421.2 and any other applicable provision of law.

**CERTIFICATE TRANSFERABILITY**

This Certificate may be transferred to the Certificate holder's successors or assigns upon transfer or sale of the Site as provided by ECL Section 27-1419.5 and 6NYCRR Part 375-1.9.

**CERTIFICATE MODIFICATION/REVOCATION**

This Certificate of Completion may be modified or revoked by the Commissioner following notice and an opportunity for a hearing in accordance with ECL Section 27-1419 and 6NYCRR Part 375-1.9(e) upon a finding that:

(1) either the Applicant or the Applicant's successors or assigns have failed to comply with the terms and conditions of the Brownfield Site Cleanup Agreement;

(2) the Applicant made a misrepresentation of a material fact tending to demonstrate that it was qualified as a Volunteer;

(3) either the Applicant or the Applicant's successors or assigns made a misrepresentation of a material fact tending to demonstrate that the cleanup levels identified in the Brownfield Site Cleanup Agreement were reached;

(4) there is good cause for such modification or revocation;

(5) either the Applicant or the Applicant's successors or assigns failed to manage the controls or monitoring in full compliance with the terms of the remedial program;

(6) the terms and conditions of the environmental easement have been intentionally violated or found to be not protective or enforceable.

The Certificate holder(s) (including its successors or assigns) shall have thirty (30) days within which to cure any deficiency or to seek a hearing. If the deficiency is not cured or a request for a hearing is not received within such 30-day period, the Certificate shall be deemed modified or vacated on the 31st day after the Department's notice.

Basil Seggos
Commissioner
New York State Department of Environmental Conservation

By: _____   Date: _December 15, 2016_

Robert W. Schick, P.E., Director
Division of Environmental Remediation



**Where to Find Information:**
*Project documents are available at the following location(s) to help the public stay informed.*

**Queens Library**
Court Square Branch
25-01 Jackson Avenue
Long Island City, NY 11101
Call for hours: (718) 937-2790

**Community Board No. 2 Office**
43-22 50th Street, 2nd Floor
Woodside, NY 11377
Call in Advance: (718) 533-8773

**NYSDEC, Region 2 Office**
47-40 21st Street
Long Island City, NY 11101
Call in advance: (718) 482-4900
Hours: Mon. to Fri. 8AM to 4 PM

**Who to Contact:**
*Comments and questions are always welcome and should be directed as follows:*

**Project-Related Questions**
Sondra Martinkat, Project Manager
NYSDEC, Region 2 Office
47-40 21st Street
Long Island City, NY 11101
(718) 482-4891
sondra.martinkat@dec.ny.gov

**Public Health questions:**
Anthony Perretta
NYSDOH
Empire State Plaza
Corning Tower Room 1787
Albany, NY 12237
(518) 402-7860
beei@health.ny.gov

**For additional information on the New York's Brownfield Cleanup Program, visit:**
www.dec.ny.gov/chemical/8450.html

# FACT SHEET #6

**Brownfield Cleanup Program**

**August 2016**

**Paragon Paint and Varnish**

5-49 46th Avenue
Long Island City, NY 11101

### SITE No. C241108
**NYSDEC REGION 2**

## Cleanup Action Completed at Brownfield Site

Action has been completed to address the contamination related to the Paragon Paint and Varnish Site ("site") located at 5-49 46th Avenue in Long Island City, NY under New York State's Brownfield Cleanup Program (BCP). Please see the attached map for the site location.

Cleanup activities were performed by 4540 Vernon Realty, LLC ("Volunteer") with oversight provided by the New York State Department of Environmental Conservation (NYSDEC). The Volunteer has submitted a draft Final Engineering Report (FER) for NYSDEC review which states that cleanup requirements have been or will be achieved to fully protect public health and the environment for the proposed site use.

**Site Description and Background:** The site is located at 5-49 46th Ave in Long Island City, NY and is identified as Block 26, Lot 4 on the Queens Tax Map. The site is approximately 25,800 square feet and is located on the city block bordered by Anable Basin Street to the north, Vernon Blvd to the east, 46th Ave to the south, and 5th Street to the west. Historic site use has included a paint factory (early-1900s to 1980). The site is being redeveloped into a 28-story residential building.

**Highlights of the Site Cleanup:** The following activities have been or will shortly be completed to achieve the remedial action objectives:

- Removal or closure in-place of eleven (11) Underground Storage Tanks (USTs);
- Excavation and off-site disposal of grossly contaminated soil and light non-aqueous phase liquid (LNAPL) source area in the courtyard to achieve the Protection of Groundwater Soil Cleanup Objectives (SCOs) for specific volatile organic compounds;
- An In-Situ Chemical Oxidation (ISCO) injection program was implemented to treat volatile organic compounds (VOCs) in groundwater and soil where excavation could not be completed, including beneath the basement of the warehouse building. Additional injections will be completed, as needed, following monitoring under the Site Management Plan (SMP).
- Import of clean fill to backfill excavated areas.
- Installation/maintenance of a site cover system comprised of the concrete building slabs for the existing on-site buildings, concrete pavement, asphalt, or a minimum of 2-feet of Recycled Concrete Aggregate (RCA).
- Installation and operation of five (5) automatic product-only recovery pumps in recovery wells to address any light non-aqueous phase liquid (LNAPL) in areas that could not be excavated.
- Recording of an Environmental Easement, including Institutional Controls (ICs) and Engineering Controls (ECs), to prevent future exposure to any residual contamination remaining at the site.
- Submission of an SMP for long term management of residual contamination as required by the Environmental Easement, including plans for: (1) ICs and ECs, (2) monitoring, (3) operation and maintenance (O&M) and (4) reporting.

*Continued on back*

# BROWNFIELD CLEANUP PROGRAM

**Next Steps:** When NYSDEC approves the FER, it will be made available to the public (see "Where to Find Information" below). NYSDEC then will issue a Certificate of Completion (COC) which will be announced in a fact sheet that is sent to the site contact list. The Volunteer will be able to redevelop the site after receiving a COC. In addition, the Volunteer:

- Will have no liability to the State for contamination at or coming from the site, subject to certain conditions; and
- Will be eligible for tax credits to offset a portion of the costs of performing cleanup activities and for redevelopment of the site.

A COC may be modified or revoked if, for example, a Volunteer does not comply with the terms of its Brownfield Cleanup Agreement with NYSDEC.

**Brownfield Cleanup Program:** New York's BCP encourages the voluntary cleanup of contaminated properties known as "brownfields" so that they can be reused and redeveloped. These uses may include recreation, housing, business or other uses. A brownfield site is any real property where a contaminant is present at levels exceeding the soil cleanup objectives or other health-based or environmental standards, criteria or guidance adopted by NYSDEC that are applicable based on the reasonably anticipated use of the property, in accordance with applicable regulations.

For more information about the BCP, visit:

**http://www.dec.ny.gov/chemical/8450.html**

*We encourage you to share this fact sheet with neighbors and tenants, and/or post this fact sheet in a prominent area of your building for others to see.*

---

**Receive Site Fact Sheets by Email**
Have site information such as this fact sheet sent right to your email inbox. NYSDEC invites you to sign up with one or more contaminated sites county email listservs available at the following web page:

**www.dec.ny.gov/chemical/61092.html**

It's quick, it's free, and it will help keep you better informed. As a listserv member, you will periodically receive site-related information/announcements for all contaminated sites in the county(ies) you select.

Note: Please disregard if you already have signed up and received this fact sheet electronically.

## Site Location Map



# EXHIBIT 4

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:   **HON. BARBARA JAFFE**                     PART     IAS MOTION 12EFM

                                          *Justice*

-----------------------------------------------------------------X   INDEX NO.       652680/2017

CSC 4540, LLC, 45-50 VERNON LP, JSMB 4540            MOTION DATE
LLC, JSMB 4540 MM LLC,

                          Petitioners,               MOTION SEQ. NO.    004

                  - v -

VERNON 4540 REALTY, LLC, 4528 VERNON                 **DECISION AND ORDER**
REALTY LLC, BRENT CARRIER,

                          Respondents.

-----------------------------------------------------------------X

The following e-filed documents, listed by NYSCEF document number (Motion 004) 125, 126, 127, 128,
129, 130, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149,
150, 151, 152, 155, 156

were read on this motion to                     _____ renew _____

     Petitioners' motion for leave to renew their motion for a mandatory injunction in aid of
arbitration, directing respondents Carrier and Vernon 4540 to transfer and assign to CSC 4540
Property Co., LLC, a partial interest in the Certificate of Completion issued by the New York
Department of Environmental Conservation under the Brownfield Cleanup Program in
connection with LLC's remediation of the Long Island City property is denied, as the hoped-for
sale of the property does not constitute the kind of exigency warranting mandatory injunctive
relief. While the sale may not proceed, there may be future opportunities and, in any event, as
petitioners were aware when they entered into the sales contract that respondents would likely
pose any number of obstacles to it, they assumed that risk. Moreover, petitioners do not
demonstrate a relationship between respondents' refusal to arbitrate and the injunctive relief they
seek.

     Accordingly, petitioners' motion for leave to renew is denied. Given this result, there is
no need to address respondents' arguments.

_____12/28/2018_____                              _____
           DATE                                        BARBARA JAFFE, J.S.C.
                                                            HON. BARBARA JAFFE

CHECK ONE:              [X] CASE DISPOSED        [ ] NON-FINAL DISPOSITION

                        [ ] GRANTED   [X] DENIED  [ ] GRANTED IN PART      [ ] OTHER

APPLICATION:            [ ] SETTLE ORDER          [ ] SUBMIT ORDER

CHECK IF APPROPRIATE:   [ ] INCLUDES TRANSFER/REASSIGN  [ ] FIDUCIARY APPOINTMENT   [ ] REFERENCE

652680/2017 Motion No. 004                                            Page 1 of 1

# EXHIBIT 5

**New York State Department of Taxation and Finance**

# Office of Counsel
# Advisory Opinion Unit

TSB-A-09(7)C
Corporation Tax
TSB-A-09(4)I
Income Tax
May 13, 2009

STATE OF NEW YORK
COMMISSIONER OF TAXATION AND FINANCE

ADVISORY OPINION          PETITION NO. Z081208A

The petitioner, ██████████ ("Petitioner"), asks whether its tangible property component of the Brownfield Redevelopment Tax Credit may be specially allocated among Petitioner's members in the same proportion as the depreciation deductions relating to the qualified tangible property that gives rise to the tax credit are allocated in the tax year the qualified tangible property is placed in service.

We conclude that the special allocation of the tangible property component of the Brownfield Redevelopment Tax Credit that is based on Petitioner's special allocation of the depreciation deductions between its members is valid, provided that the special allocation of the depreciation deductions has substantial economic effect.

**Facts**

Petitioner is a New York limited liability company classified as a partnership for Federal and New York tax purposes. Substantially all of the interests in Petitioner are owned by other limited liability companies. All of the members of those other limited liability companies are individuals or trusts subject to New York personal income tax, or are corporations subject to New York corporation franchise tax.

Petitioner is currently a party to a Brownfield Site Cleanup Agreement with the New York State Department of Environmental Conservation ("DEC") to remediate and redevelop a qualified site. The DEC issued a notice to Petitioner that its request for participation in the Brownfield Cleanup Program had been accepted. The DEC issued a Certificate of Completion ("COC") to Petitioner prior to June 23, 2008, so that the amendments made by Chapter 390 of the Laws of 2008 to Tax Law section 21 do not apply. Petitioner has not yet placed into service qualified tangible property that will give rise to a portion of the tax credits, but expects to do so during tax years 2009 and 2010, or a date no later than ten years from the date of the issuance of the COC.

Petitioner anticipates that a new member ("Investor"), which is likely to be a business entity classified as a corporation for Federal and New York corporation tax purposes, will make a cash contribution to the capital of Petitioner before the qualified tangible property is placed in service. In exchange for the capital contribution, Investor will receive through 2014, a 5% interest in the profits and losses of Petitioner. Thereafter, Investor will have a .01% interest in the profits and losses of Petitioner. For 2009 and 2010, Petitioner plans on allocating 99.99% of the depreciation deductions with respect to qualified tangible property and the tangible property component of the Brownfield Redevelopment Credit to Investor. The remaining .01% will be allocated to the existing members of Petitioner. It is Petitioner's position that the special allocation of the depreciation deductions for tax years 2009 and 2010 will have substantial economic effect for Federal tax purposes.

**Analysis**

Although some credits (e.g. QEZE real property and tax reduction credits and the film production credit) reference a partner's "pro rata share," this is not a defined term in the statute. Other than these instances, the Tax Law does not contain any specific explanation on how to allocate New York State credits.

The regulations under Article 9-A state that the general rule for the computation of tax under the aggregate method for corporate partners is that a taxpayer's distributive share (as that term is defined in section 704 of the Internal Revenue Code) of each partnership item of receipts, income, gain, loss and deduction and the taxpayer's proportionate part of each partnership asset and liability and each partnership activity shall have the same source and character in the hands of the partner for Article 9-A purposes as that item has in its hands for federal income tax purposes. (See, 20 NYCRR §3-13.3(a)(1).)

Section 704 of the IRC defines a partner's distributive share, in relevant part, as follows:

(a) Effect of Partnership Agreement. – A partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement.

(b) Determination of Distributive Share – A partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances), if –

(1) the partnership agreement does not provide as to the partner's distributive share of income, gain, loss, deduction, or credit (or item thereof), or

(2) the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) *does not have substantial economic effect* (emphasis added).

The Article 9-A regulations also provide that an allocation of an item, amount, or activity, even if recognized for Federal income tax purposes, will not be recognized when its principal purpose is the avoidance or evasion of any tax imposed on the taxpayer. Where an allocation is not recognized, the taxpayer's distributive share will be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances). The regulation then describes the circumstances to be considered in determining whether a principal purpose of an allocation of an item, amount or activity is the avoidance or evasion of any tax imposed on the taxpayer. Among the relevant circumstances are whether the allocation has substantial economic effect, and whether the related items of partnership income, gain, loss and deduction from the same source are subject to the same allocation. (See, 20 NYCRR § 3-13.3(a)(3)).

For federal income tax purposes, a special allocation of a tax credit may be allowed if the sole component in the calculation of the tax credit is a partnership *expenditure* and that partnership *expenditure* has a valid special allocation of loss or deduction (or other downward capital account adjustments) in the partnership's tax year, so that the partners' interests in the partnership with respect to the credit are in the same proportion as the partners' distributive shares of loss or deduction which relate to such *expenditure*. (See, Treas. Reg. § 1.704-1(b)(5), example (11)).

While the Article 9-A regulations do not specifically cover the proper allocation of a New York State tax credit, it is reasonable to conform this allocation to the principles in those regulations and the federal regulatory principle on the allocation of federal tax credits. This leads to the conclusion, for purposes of this inquiry, that if a partnership expenditure is the sole component in the calculation of the New York tax credit and the New York tax credit is allocated in the same way as that *expenditure* is allocated among the partners, the allocation of the New York tax credit is valid if it does not have as a principal purpose the avoidance or evasion of any tax imposed on the taxpayer, and the allocation of the *expenditure* has substantial economic effect.

According to the facts provided by Petitioner and the LLC agreement, Investor has a 5% interest in the profits and losses of Petitioner through 2014 and thereafter Investor will have a 1% interest in the profits and losses. However, Investor will be allocated 99.99% of the tangible property component of the Brownfield Redevelopment Tax Credit and the depreciation deductions with respect to such property for tax years 2009 and 2010. The tangible property credit component is equal to the applicable percentage of the cost or other basis for federal income tax purposes of tangible personal property and other personal property, including buildings and structural components of buildings, which constitute qualified tangible property. (See, Tax Law §21(a)(3)). Thus, because the calculation of Petitioner's tangible property credit component is based solely on the cost or other basis in the property for federal income tax purposes and the depreciation deduction for such property also relies on the property's federal basis, the credit allocation is following the expenditure allocation. In the Internal Revenue Service Chief Counsel Advice (CCA 200812023), the Internal Revenue Service concluded that the section 42 low income housing tax credit could be allocated in the same proportion as the special allocation of the partnership's depreciation deduction. The position in this Chief Counsel Advice is consistent with 26 C.F.R. § 1.704-1(b)(5) example 11(i) and (ii).

Accordingly, if Petitioner's special allocation of 99.99% of the depreciation deductions to Investor has substantial economic effect and is valid for federal and state tax purposes, then the same allocation of the tangible property component of the Brownfield Redevelopment Tax Credit to Investor is a valid allocation.

DATED: May 13, 2009
_____/S/_____
Jonathan Pessen
Director of Advisory Opinions
Office of Counsel

NOTE:        An Advisory Opinion is issued at the request of a person or entity. It is limited to the facts set forth therein and is binding on the Department only with respect to the person or entity to whom it is issued and only if the person or entity fully and accurately describes all relevant facts. An Advisory Opinion is based on the law, regulations, and Department policies in effect as of the date the Opinion is issued or for the specific time period at issue in the Opinion.



**New York State Department of Environmental Conservation**
**Division of Environmental Remediation**
625 Broadway, 12th Floor, Albany, New York 12233-7011
**Phone:** (518) 402-9706• **FAX:** (518) 402-9020
**Website:** www.dec.state.ny.us

July 18, 2011

Joe Martens
Commissioner

Donald Rattner
549 46th Avenue LLC
94 Joralemon Street, 3
Brooklyn, New York 11201

Angela Krevey
Anable Beach, Inc.
375 South End Avenue, 6s
New York, New York 10280

Brent Carrier
Vernon 4540 Realty LLC
45 Carleon Avenue
Larchmont, NY 10538

Re:    Paragon Paint and Varnish Corp (Site)
       Site No.: C241108
       Property County: Queens
       Amendment #2

Dear Applicants:

This letter is forwarded to your attention in response to the application submitted to amend the Brownfield Cleanup Agreement ("BCA" or "Agreement") signed on September 4, 2008, and amended by letter dated August 17, 2010. The application requested that the above referenced BCA be amended to add an additional party, namely: Vernon 4540 Realty LLC, 45 Carleon Avenue, Larchmont, New York, 10538.

The above request is hereby granted, and incorporated into, and are enforceable pursuant to the subject Agreement, effective immediately upon receipt of this letter. This Amendment is made in accordance with and subject to all of the BCA and all applicable guidance, regulations and state laws applicable thereto. All other substantive and procedural terms of the Agreement will remain unchanged and in full force and effect regarding the parties to the Agreement.

Please have authorized representatives counter sign this letter to acknowledge acceptance of this amendment, and send a copy back to the Department at:

New York State Department of Environmental Conservation
Division of Environmental Remediation
625 Broadway, 12th Floor
Albany, New York 12233-7011



INTERNATIONAL YEAR
OF FORESTS 2011

Please keep a copy of the countersigned letter as proof of the BCA Amendment.

Nothing contained herein constitutes a waiver by the Department or the State of New York of any rights held in accordance with the Agreement or any applicable state and/or federal law or a release for any party from any obligations held under the Agreement or those same laws.

Please contact me if you have any questions in this regard. Thank you for your assistance in this matter.

Sincerely,

Dale A. Desnoyers
Director
Division of Environmental Remediation

The following Applicants, in signing this letter, do hereby acknowledge and accept the amendment to the BCA as set forth above.

Anable Beach, Inc.   President                          7/21/11
                                                         Date

549 46th Avenue LLC                                      Date

as Authorized Signatory
Vernon 4540 Realty LLC.                                  7/21/11
                                                         Date

ec:    Ben Conlon
       Lou Oliva
       Robert Schick
       Robert Cozzy
       Jane O'Connell
       Laura Zeppetelli
       Elissa Armater
       Kelly Lewandowski
       Michael Bogin (mbogin@sprlaw.com)
       Joseph Duminuco (jduminuco@rouxinc.com)
       Brent Carrier (bcarrier@credevelopment.com)
       Donald Rattner (drattner@thecivilstudio.com)
       Angela Krevey (info@fryingpan.com)

**New York State Department of Environmental Conservation**
**Division of Environmental Remediation**
**Bureau of Technical Support, 11th Floor**
625 Broadway, Albany, NY  12233-7020
**Phone:  (518) 402-9553 • Fax:  (518) 402-9547**
**Website:**  www.dec.ny.gov



Joe Martens
Commissioner

June 24, 2011

Mr. Brent L. Carrier, President
Vernon 4540 Realty, LLC
6 East 45th Street
New York, NY  10017

   RE: Application for Amendment (Change in Part)
     Site Name:  Paragon Paint & Varnish Co.
     Site ID #:  C241108

Dear Mr. Carrier:

  The New York State Department of Environmental Conservation (Department) is in receipt of your amended application for change in party for participation in the Brownfield Cleanup Program (BCP) pursuant to ECL Section 27-1400 et seq.  We are pleased to advise you that your application for amendment adding a party (new requestor name) has been determined to be complete.

  Previously, you fulfilled your requirements of publishing the notice in a local newspaper servicing the site area as well as mailing the public notice to parties on the site contact list. Therefore, you are not required to do so as a condition of this Amendment.

      Sincerely,

      *Kelly A Lewandowski*

      Kelly A. Lewandowski, P.E.
      Chief
      Site Control Section

KAL/WB/sjs



ec:  M. Bogin
     J.  Duminuco
     S. Martinkat-Taule, NYSDEC Project Manager
     R. Cozzy, NYSDEC, DER, Dir. Remedial Bureau B
     J.  O'Connell, NYSDEC, RHWE, Region 2
     B. Conlon, NYSDEC, OGC Superfund and Voluntary Cleanup Bureau
     L. Oliva, NYSDEC, OGC, Region 2
     S. Bolesky, NYSDEC, DER, Program Management


ec w/pdf application:
     D. Hasso, NYSOSC
     S.  Bates, NYS DOH

# Overlapping 2016 BTC Claims:
## a. CSC $3,848,483
## b. Carrier $8,015,515

Brownfield Tax Credits ("BTC") and related Tax Refund consist of separate and distinct "applications" currently under audit by the NY State Dept. of Tax and Finance.  A Brownfield Cleanup Agreement is a requirement under NY State Tax Law to obtain related remediation Tax Refunds. (See Ex. C)

a. **$13,744,583 611.1 BTC Claim, with $3,848,483 Tax Refund**
THIS certain BTC claim (ex a.) was filed in 2019 by CSC 4540 LLC without benefit of being a party to the requisite approved Brownfield Cleanup Agreement; this claim is purportedly now under audit by the NYS DTF and is purported to provide for a potential tax refund of $3.9M paid directly to the taxpaying members of Plaintiff CSC 4540 LLC.
Section 8.2 of CSC 4540 LLC's LLC Agreement allocates 50% of such 2019 filed BTC claim to Plaintiffs 45-50 Vernon LP and JSMB 4540 LLC, as members of CSC 4540 LLC, and these Plaintiffs' taxpayer members have directly applied for $1.9M in Tax Refunds.
Defendant Debtor Vernon 4540 Realty LLC <u>did not</u> apply for its 50% allocation of CSC 4540 LLC's 2019 filed BTC under this defective claim and is ineligible under the NYS Statute of Limitations to now amend its 2016 tax filings to do so.
Plaintiffs Motion clearly defines the certain BTC and Tax Refund subject to this proceeding as those specifically derived from the LLC Agreement of CSC 4540 LLC; BTC allocated to Debtor in Section 8.2 of the LLC Agreement and to be paid in the form of a tax refund to Debtor's member Brent Carrier in the amount of at least $1.9M and as much as $2.5M; and again more specifically in the March 8, 2021 transcript Page 28 lines 14-20, and again on Page 29 lines 1-17.

b. **$28,526,790 611.1 BTC Claim, with $7,987,790 Tax Refund**
**$56,029 613 BTC Claim, with $28,014 Tax Refund**
THIS certain BTC claim (ex b1-5), filed in 2017 by Debtor Vernon 4540 Realty LLC, a 2011 signatory to the requisite and approved Brownfield Cleanup Agreement and currently before the NYS DTF provides for a refund of 10.2M, directly to Debtor's taxpaying member Brent Carrier, as allocated in Section 8.2(b) of the Debtor Vernon 4540 Realty LLC's 2011 LLC Agreement.



**Where to Find Information:**
*Project documents are available at the following location(s) to help the public stay informed.*

**Queens Public Library**
Court Square Branch
25-01 Jackson Avenue
Long Island City, NY 11101
Call for hours: (718) 937-2790

**Community Board No. 2 Office**
43-22 50th Street, 2nd Floor
Woodside, NY 11377
Call in Advance: (718) 533-8773

**NYSDEC, Region 2 Office**
47-40 21st Street
Long Island City, NY 11101
Call in advance: (718) 482-4900
Hours: Mon. to Fri. 8AM to 4PM

**Who to Contact:**
*Comments and questions are always welcome and should be directed as follows:*

**Project-Related Questions**
Sondra Martinkat, Project Manager
NYSDEC, Region 2 Office
47-40 21st Street
Long Island City, NY 11101
(718) 482-4891
sondra.martinkat@dec.ny.gov

**Health-Related Questions:**
Anthony Perretta
NYSDOH
Empire State Plaza
Corning Tower Room 1787
Albany, NY 12237
(518) 402-7860
beei@health.ny.gov

**For additional information on the New York's Brownfield Cleanup Program, visit:**
www.dec.ny.gov/chemical/8450.html

# FACT SHEET #7
**Brownfield Cleanup Program**

**Paragon Paint and Varnish**
5-49 46th Avenue
Long Island City NY 11101

**SITE No. C241108**

**December 2016**   NYSDEC REGION 2

## NYSDEC Certifies Cleanup Requirements Achieved at Brownfield Site

The New York State Department of Environmental Conservation (NYSDEC) has determined that the cleanup requirements to address contamination related to the Paragon Paint and Vanish Corp. site ("site") located at 5-49 46th Avenue in Long Island City, NY, under New York State's Brownfield Cleanup Program (BCP) have been met. Please see the map for the site location.

The cleanup activities were performed by 4540 Vernon Realty LLC ("Volunteer") with oversight provided by the New York State Department of Environmental Conservation (NYSDEC). NYSDEC has approved a Final Engineering Report (FER) and issued a Certificate of Completion (COC) for the site. Copies of the FER and Notice of the COC are available at the location(s) identified under "Where to Find Information."

**Completion of the Project:** The following activities have been or will be completed to achieve the remedial action objectives:

- Removal or closure in-place of eleven (11) underground storage tanks;
- Excavation and off-site disposal of grossly contaminated soil and light non-aqueous phase liquid (LNAPL) source area in the courtyard to achieve the Protection of Groundwater Soil Cleanup Objectives (SCOs) for specific volatile organic compounds;
- An In-Situ Chemical Oxidation injection program was implemented to treat volatile organic compounds in groundwater and soil where excavation could not be completed, including beneath the basement of the warehouse building. Additional injections will be completed, as needed, following monitoring under the Site Management Plan (SMP).
- Import of clean fill to backfill excavated areas.
- Installation/maintenance of a site cover system comprised of the concrete building slabs for the existing on-site buildings, concrete pavement, asphalt, or a minimum of 2-feet of Recycled Concrete Aggregate.
- Installation and operation of five (5) automatic product-only recovery pumps in recovery wells to address any LNAPL in areas that could not be excavated.
- Recording of an Environmental Easement, including Institutional Controls (ICs) and Engineering Controls (ECs), to prevent future exposure to any residual contamination remaining at the site.
- Submission of an SMP for long term management of residual contamination as required by the Environmental Easement, including plans for: (1) ICs and ECs, (2) monitoring, (3) operation and maintenance (O&M) and (4) reporting.

**Final Engineering Report Approved:** NYSDEC has approved the FER, which:

- Describes the cleanup activities completed.
- Certifies that cleanup requirements have been or will be achieved for the site.
- Describes any institutional/engineering controls to be used. An institutional control is a non-physical restriction on use of the site, such as a deed restriction, when contamination left over after the cleanup action makes the site suitable for some, but not all uses. An engineering control is a physical barrier or method to manage contamination such as a cap or vapor barrier.

# BROWNFIELD CLEANUP PROGRAM

- Certifies that a site management plan for any engineering controls used at the site has been approved by NYSDEC.

The following institutional controls have been put in place on the site:
- Site Management Plan
- Groundwater Use Restriction
- Land Use Restriction
- Environmental Easement

The following engineering controls have been put in place on the site:
- Cover System
- LNAPL Recovery System

**Next Steps:** With its receipt of a COC, the applicant is eligible to redevelop the site. In addition, the applicant:

- Has no liability to the State for contamination at or coming from the site, subject to certain conditions; and
- Is eligible for tax credits to offset the costs of performing cleanup activities and for redevelopment of the site.

A COC may be modified or revoked if, for example, there is a failure to comply with the terms of the order or agreement with NYSDEC.

**Site Description and Background:** The site is located at 5-49 46th Ave. in Long Island City, NY and is identified as Block 26, Lot 4 on the Queens Tax Map. The site is approximately 25,800 square feet and is located on the city block bordered by Anable Basin Street to the north, Vernon Blvd to the east, 46th Ave to the south, and 5th Street to the west. Historic site use has included a paint factory (early-1900s to 1980) and its operations resulted in contamination of soil and groundwater with volatile organic compounds and light, non-aqueous phase liquid which was addressed with this remediation. The site is being redeveloped into a 28-story residential building.

Additional site details, including environmental and health assessment summaries, are available on NYSDEC's Environmental Site Remediation Database (by entering the Site ID, C241129) at:

http://www.dec.ny.gov/cfmx/extapps/derexternal/index.cfm?pageid=3

**Brownfield Cleanup Program:** New York's Brownfield Cleanup Program (BCP) encourages the voluntary cleanup of contaminated properties known as "brownfields" so that they can be reused and redeveloped. These uses may include recreation, housing, business or other uses. A brownfield site is any real property where a contaminant is present at levels exceeding the soil cleanup objectives or other health-based or environmental standards, criteria or guidance adopted by NYSDEC that are applicable based on the reasonably anticipated use of the property, in accordance with applicable regulations.

For more information about the BCP, visit:

http://www.dec.ny.gov/chemical/8450.html

*We encourage you to share this fact sheet with neighbors and tenants, and/or post this fact sheet in a prominent area of your building for others to see.*

**Receive Site Fact Sheets by Email**
Have site information such as this fact sheet sent right to your email inbox. NYSDEC invites you to sign up with one or more contaminated sites county email listservs available at the following web page:
www.dec.ny.gov/chemical/61092.html

It's quick, it's free, and it will help keep you better informed. As a listserv member, you will periodically receive site-related information/announcements for all contaminated sites in the county(ies) you select.

Note: Please disregard if you already have signed up and received this fact sheet electronically.

# EXHIBIT 6

Latisha,

Per our status conference with the Judge on Friday, below are our comments on the draft 2013, 2014 and 2015 tax returns.

1.) The returns and K-1s seem to suggest that Vernon has no interest in profits and losses (see all of the K-1s, Part II, Item J).  This appears to be contractually inaccurate.  According to Exhibit C of the LLC Agreement of CSC 4540, the Class B member (i.e., Vernon 4540 Realty LLC) certainly has an interest in CSC's profits and losses.  Help me understand why the accountants allocated all profits and losses to the other entities.

2.) Schedule M-2 of the 2013 return appears to indicate that cash of $10,600,304 was contributed in 2013.  This is inconsistent with Brent's recollection of the timing of this cash contribution.   Help us understand the basis for this entry.

3.) The 2013 return lists $10,338,801 in "Statement 3" and describes it as "Construction in Progress."  It is Brent's recollection that no construction was conducted by CSC during 2013.  Moreover, we believe a portion of these funds were used to satisfy a prior mortgage on the property.  Help us understand why the accountants have decided to include them in this manner on the 2013 return.

Obviously these issues impact the 2014 and 2015 returns as well.

At the status conference, you indicated that you would provide financial statements in accordance with CSC's obligation under the LLC agreement.  Under sections 10.1, 10.3, 10.5(b), and 11.3, the Members are permitted access to various financial records of the CSC.  As we are not interested in bogging this process down with requests for voluminous records, we believe copies of the audited annual financial statements for each year (referenced in sections 10.1 and 11.3) will suffice.

Finally, you now have my comments with respect to the 2013 through 2015 draft returns.  Per our status conference discussion, please provide the pro forma 2016 tax returns with accompanying K-1 and IT-204-IP, *New York Partner's Schedule K-1*, at your earliest convenience.

Thank you.

Best,
Joe

---

**Joseph N. Endres**
Partner
Hodgson Russ LLP

Tel:  716.848.1504 | Fax:  716.819.4711

The Guaranty Building | 140 Pearl Street, Suite 100 | Buffalo, NY 14202 | Tel:  716.856.4000 | map

Twitter  | LinkedIn | website | Bio | e-mail | vCard

*This message may contain confidential information that is protected by the attorney-client privilege or otherwise. If you are not the intended recipient, you are notified that any disclosure, copying, or use of the contents of this message is strictly prohibited. If this message has been received by you in error, please notify the sender immediately by e-mail and delete the original message. Thank you*

1

1

2    SUPREME COURT OF THE STATE OF NEW YORK

3    COUNTY OF NEW YORK : CIVIL TERM : Part 12

4    ------------------------------------------------x

5    CSC 4540, LLC, 45-50 VERNON LP, JSMB 4540
      LLC, and JSMB 4540 MM LLC,

6                                 Index: 652680/2017

7                        Petitioners,

        -against-

8

     VERNON 4540 REALTY, LLC

9    and BRENT CARRIER,

10                     Respondents.

11    ------------------------------------------------x

12             60 Centre Street
             New York, New York 10007

13             December 20, 2017

14    B E F O R E: HONORABLE BARBARA JAFFE, Supreme Court Justice

15

     A P P E A R A N C E S:

16

17        MORRISON COHEN, LLP
        attorneys for the Petitioners

18        909 Third Avenue
        New York, New York 10022

19        BY: LATISHA V. THOMPSON, ESQ.
           CHRISTOPHER W. PENDLETON, ESQ.

20

21

       LAW OFFICES OF STEVEN C. BAGWIN

22        attorney for the Respondents
        245 Saw Mill River Rd

23        Hawthorne, New York 10532
        BY: STEVEN C. BAGWIN, ESQ.

24

25              Michael Ranita

26            Senior Court Reporter

1

2     doing justice by making sure that at least somebody gets

3     these tax credits.

4             I'm not satisfied right now that she could get an

5     extension.  Actually, I don't know whether she can or can't.

6             MR. BAGWIN:  She hasn't even tried, I don't think.

7             MS. THOMPSON:  We have tried.  This was our last

8     resort, coming to Mr. Carrier.  We've done everything and --

9             THE COURT:  And right now your client's hands are

10    not the cleanest.

11            MR. BAGWIN:  I disagree, your Honor.  And I don't

12    think their hands are the cleanest either.  Then can I get

13    an agreement from them before you issue your order that

14    they're gonna restore his capital account?

15            MS. THOMPSON:  Yes.  This is the offer we made to

16    him.  What we said to you is -- listen, we will do whatever

17    -- as long as the accountants say it's legal, we will

18    restore the capital account.  That's on the record.  You

19    don't even need an agreement.  It's on the record.

20            If we don't do it, you can come back and hold us in

21    contempt.  It's on the record.

22            MR. BAGWIN:  And what about when the tax comes in,

23    are you going to give him his appropriate K-1?

24            MS. THOMPSON:  I assume -- listen, I assume so.

25    Whatever he needs, we will give it to him.  Listen, he could

26    sign the consent.  We could come back before the Judge in

18

```
1
2    three weeks for a status conference, if it's about making
3    the documents reflect what he needs.
4              MR. BAGWIN:  Okay.
5              MS. THOMPSON:  And --
6              MR. BAGWIN:  You understand that his initial
7    capital account was five and a half million dollars; is that
8    in dispute or not in dispute?
9              MS. THOMPSON:  As we sit here today, I don't know
10   the initial amount, but I do believe the initial capital
11   account was around $5 million.
12             MR. BAGWIN:  It was five and a half million.
13             MS. THOMPSON:  This is what I'm saying, whatever it
14   is, whatever it was, we can work out the agreement between
15   us, in terms of what he feels he would like his capital
16   account to go ahead and say.  If we can agree, we could
17   submit it to the Judge.  If we can't, she'll make an order
18   in your favor, I'm sure, um, and it will be done, but we
19   just need this consent executed and let's get the tax credit
20   for everyone's benefit.
21             THE COURT:  I think that would be the best.  I
22   really do.
23             MR. BAGWIN:  Is that your order, your Honor?
24             THE COURT:  It is.  It's so order.
25             MR. BAGWIN:  I just -- I need the restoration of
26   the capital account.  We need the tax returns amended.  I
```

19

need some kind of assurances --

    MS. THOMPSON:  We are absolutely amending the tax returns.

**"he" = Carrier**

    MR. BAGWIN:  When the tax return comes in, he should be entitled to his 50 percent of what comes in.

    MS. THOMPSON:  Yes, but here's the thing, and we are happy -- if the court want us to put it in escrow, whatever we want, until the tax returns come in, and it's audited, because that's the thing with the Brownfield --

    THE COURT:  That's a great idea.

    MR. BAGWIN:  Then we want the money.  If you agree to put it in escrow as well, that's fine.  And my client --

    MS. THOMPSON:  Just the tax credit portion, to be clear.

    MR. BAGWIN:  As opposed to?

    THE COURT:  Anything else.

    MS. THOMPSON:  As opposed to anything -- I have no idea what they're tax returns look like in terms of what they are entitled to.

    MR. BAGWIN:  Your Honor, now here's a wrinkle. They went and they got an injunction from Mr. Carrier and his company from transferring assets.  This is technically an asset of his company.

    MS. THOMPSON:  There is no transfer here.

    MR. BAGWIN:  In a sense, he is transferring an

1

2      asset.  He's moving an asset that he believes is his, to

3      you.

4             MS. THOMPSON:  What transfer though?

5             MR. BAGWIN:  You are asking for him to give up

6      certain rights --

7             MS. THOMPSON:  No, I'm not.

8             MR. BAGWIN:  -- for a potential asset.

9             MS. THOMPSON:  No, I'm not.

10            MR. BAGWIN:  I don't know.  I'm just concerned that

11     it's a violation of that order.

12            THE COURT:  If it were, nobody is complaining about

13     it.

14            MR. BAGWIN:  I understand, your Honor, but maybe

15     you should say something that would reflect that, that it

16     would not be a violation of your order.

17            THE COURT:  Ms. Thompson?

18            MS. THOMPSON:  I do not believe it is a violation

19     of the order.  I will not bring a claim that you've violated

20     the order, in any way, by signing the consent form.

21            THE COURT:  That's it.  That's it.  So I'm signing

22     the TRO, and we have to -- I think the transcript is enough.

23     This transcript is enough.  You know, then we just resolved

24     this whole motion.  We don't even have to come back.

25            MS. THOMPSON:  We don't.

26            THE COURT:  Mr. Bagwin, justice is done here.  And

1

2    your client is not prejudiced in any manner, shape or form.

3    So I don't even have to sign this.  Do you want to withdraw

4    this?  Oh, the TRO.  I'm signing TRO.

5            MS. THOMPSON:  The TRO, and assuming that the order

6    on the record stands that his client is --

7            MR. BAGWIN:  Wait, but how long does the TRO stay

8    in effect?

9            MS. THOMPSON:  You want to keep the TRO in effect

10   for the three weeks or until we can work out an agreement

11   that your client is happy with, and then if not, we'll come

12   back before the Judge and the Judge will hear --

13           THE COURT:  Perfect.

14           MR. BAGWIN:  That's fine.

15           THE COURT:  Perfect, that's perfect.  I just don't

16   know what noises to make on this.

17           MS. THOMPSON:  The only other thing, I would -- we

18   ask that we get the signed consent form back by Friday.

19           MR. BAGWIN:  I'll do the best I can.

20           THE COURT:  Well, and if you don't do it, it's

21   going to be called a contempt.

22           MR. BAGWIN:  I understand, Judge.

23           THE COURT:  With all the bells and whistles that go

24   with it.

25           Now, going back to -- I remember the last time we

26   spoke, and that's why I had Ms. Paszkowska e-mail you,

Michael A. Ranita - Senior Court Reporter



CRE Development

**CSC 4540 LLC – Partnership Accounting**

Limited Liability Company Agreement, dated November 15, 2013

Class A Members:

- Manresa Limited, a Cayman Islands limited company, c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005
- JSMB 4540 LLC, a New York limited liability company, c/o Simon Development Group, 230 Park Avenue, Suite 539, New York, NY 10169

Class B Member:

- Vernon 4540 Realty LLC, a Delaware limited liability company, 45 Carleon Ave., Larchmont, NY 10538

Class C Member:

- JSMB 4540 MM LLC, c/o Simon Development Group, 230 Park Avenue, Suite 539, New York, NY 10169

**Form 1065 U.S. Return of Partnership Income Filings:**

| 2013: CSC 4540 Property Co LLC (EIN 46-4028405) | Share of Profit | Share of Capital | Beginning Capital | Ending Capital |
|---|---|---|---|---|
| Andromeda Property Holdings Limited | 62.91% | 62.91% | 9,858,283 | 9,858,283 |
| JSMB 4540 LLC | 4.74% | 4.74% | 742,021 | 742,021 |
| Vernon 4540 Realty LLC | 32.35% | 32.35% | 5,500,000 | 5,500,000 |

2014 CSC 4540 Property Co LLC (EIN 46-4028405)

| Andromeda Property Holdings Limited | 68.02% | 68.02% | 9,858,283 +4,075,781 | 0 |
|---|---|---|---|---|
| 45-40 Vernon LP | 82.3% | 82.3% | 0 | 13,934,233 |
| JSMB 4540 LLC | 6.2% | 6.2% | 742,021 | 1,048,813 |
| Vernon 4540 Realty LLC | 11.5% | 11.5% | 5,500,000 | 411 |

| 2015: CSC 4540 LLC (EIN 46-4004440) | | | | |
|---|---|---|---|---|
| 45-50 Vernon LP | 93% | 93% | 13,934,644 | 21,831,750 |
| JSMB 4540 LLC | 7% | 7% | 1,048,813 | 1,726,014 |
| Vernon 4540 Realty LLC | deleted | deleted | deleted | deleted |

2016: NOT PROVIDED



CRE Development

**additional notes of apparent errors/discrepancies:**

2013 tax filing:

1. Partnership files incorrectly as CSC 4540 Property CO LLC instead of CSC 4540 LLC.
2. Partner Manresa Limited, a Cayman Island entity, is not shown on tax return
3. Managing Member JSMB 4540 is not indicated as member-manager
4. Vernon 4540 is not shown as having contributed property with a built-in gain or loss
5. "Partner" Andromeda, a Chanel Island entity, appears as a partner though is unknown to Vernon 4540, and is listed as a "Domestic" partner
6. 2013 Brownfields expenditures are not properly allocated 50/50 between the Class A and Class B members


2014 tax filing:

1. Partnership again files incorrectly as CSC 4540 Property Co LLC instead of CSC 4540 LLC.
2. CSC 4540 Property Co Form 1065 does not indicate it is a Final Return for said entity.
3. Partner Manresa Limited, a Cayman Island entity, is not shown on tax return
4. Managing Member JSMB 4540 is not indicated as member-manager
5. Vernon 4540 is not shown as having contributed property with a built-in gain or loss
6. Vernon 4540 has its Partners share of profit, loss and capital reduced to 11.5%, despite partnership agreement specifying Vernon 4540 to hold a 30% interest in profits.
7. Vernon 4540 is indicated to have a negative $5,500,000 contributed during tax year 2014.  This book entry was never disclosed to Vernon 4540 and is incorrect.
8. "Partner" Andromeda, a Chanel Island entity, is removed as a partner after being credited with $4,075,781 in 2014 capital contributions, and is again listed as a "Domestic" partner
9. "Partner" 45-40 Vernon LP appears to replace Andromeda, though with an increase of stated capital and profit share from 68.02% to 82.3%, this entity is still unknown and undisclosed to Vernon 4540.
10. 2014 Brownfields expenditures are not properly allocated 50/50 between the Class A and Class B members



CRE Development

2015 tax filing:

1. Partnership now files as CSC 4540 LLC, but misrepresents membership, also does not notate filing as "Initial return"
2. Partner Manresa Limited, a Cayman Island entity, is not shown on tax return
3. Vernon 4540 is not shown as a member with any economic interest in CSC 4540 LLC
4. "Partner" 45-40 Vernon LP, is completely omitted as a partner despite ending 2014 as the 82.3% owner of CSC 4540 Property Co LLC
5. "Partner" 45-50 Vernon LP now appears to apparently replace both 45-40 Vernon LP and Vernon 4540 Realty LLC, though with an increase of stated capital and profit share of 93.0
6. 2015 Brownfields expenditures are not properly allocated 50/50 between the Class A and Class B members

2016 tax filing:

1. These tax returns have not been provided to Vernon 4540 Realty LLC despite repeated written requests.

Office of Budget and Management Analysis
W A Harriman Campus, Albany NY 12227

April 08, 2021

Brent Carrier
Vermon 4540 Realty, LLC
45 Careleon Avenue
Larchmont, NY 10538-

Re: CSC 4540, LLC

Dear Brent Carrier:

In response to your request for tax information regarding the above-referenced taxpayer, the following is provided:

Enclosed re images of the Partnership Returns filed for tax years 2013 through 2019.

Due to the filing of an extension, the Partnership Return for tax year 2020 is not due to be filed until September 15, 2021.

A search of our records has failed to locate Corporation Tax Returns filed for tax years 2013 through 2019. Corporation Tax Returns for tax year 2020 are not due to be filed until April 15, 2021.

For questions related to New York State Partnership returns, please call (518) 457-5181.

To cover the cost of processing your request, please send a check or money order made payable to the Commissioner of Taxation and Finance in the amount of $49.50.
Mail check to NYS Department of Taxation and Finance, Disclosure and Government Exchange Unit, Building 8, Room 700, W A Harriman Campus, Albany, NY 12227.

If you have questions regarding your request, please call (518) 530-4366.

Sincerely,

Thomas Engel
Income Tax Technician III



SUBMISSION ID: ~~~~~~~~~~~~~~~~~~~~~~~~  DLN: ~~~~~~~~~~~~~

Department of Taxation and Finance

# Partnership Return

**IT-204**

See instructions, Form IT-204-I  For calendar year **2019**  or tax year beginning **01-01-2019** **19**  and ending **12-31-2019**

| Legal name CSC 4540 LLC | Employer identification number (EIN) 464004440 |
|---|---|

Trade name of business if different from legal name above | NYS Principal business activity REAL ESTATE

Address *(number and street or rural route)* 757 3RD AVENUE 17TH FLOOR | City, village, or post office NEW YORK | NAICS business code number *(from NYS Pub 910)* 531390

| State NY | ZIP code 10017 | Country US | Date business started 11-15-2013 | Principal product or service REAL ESTATE |
|---|---|---|---|---|

Special conditions for filing your 2019 tax return *(see instructions)*

## Section 1 - Partnership information

**A** Mark an **X** in the box that applies to your entity
☐ Regular partnership ☐ Limited liability partnership (LLP) ☐ Portfolio investment partnership (see instr.) ☐ Other
☑ Limited liability company (LLC - including limited liability investment company and a limited liability trust company)

**B** 1) Did the partnership have any income, gain, loss, or deduction derived from NY sources during the tax year?.... **B1** Yes ☑ No ☐

2) If *No*, enter the number of resident partners.................................................. **B2**

**C** Mark applicable box(es) ☐ Change of address ☐ Initial return ☐ Amended return ☐ Final return *(submit explanation)*

**D** 1) Is this return the result of federal audit changes?............................. **D1** Yes ☐ No ☑

If *Yes* : 2) Enter date of final federal determination............................ **D2**

3) Do you concede the federal audit changes?............... **D3** Yes ☐ No ☐

**E** Did you file a NYS partnership return for: 1) 2017?............................ **E1** Yes ☑ No ☐

2) 2018?............................ **E2** Yes ☑ No ☐

If *No*, state reason:

**F** Number of partners 1) Article 22................. **F1** 2
2) Article 9-A................. **F2** 1
3) Other................. **F3**
4) Total................. **F4** 3

**G** Does the partnership currently have tax accounts with NYS for the following taxes?
1) Sales and use tax Yes ☐ No ☑ ......*(if Yes, enter ID number)*............ **G1**
2) Withholding tax Yes ☐ No ☑ ......*(if Yes, enter ID number)*............ **G2**

**H** Did the partnership have an interest in real property located in NYS during the last three years?........................... **H** Yes ☑ No ☐

**I** Has there been a transfer or acquisition of a controlling interest in this entity during the last three years?.............. **I** Yes ☐ No ☑

**J** Did the partnership engage in a like-kind transaction under IRC 1031 during the tax year?........................... **J** Yes ☐ No ☑

| Third - party designee? *(see instr.)* | Print designee's name JOHN OHANNESSIAN | Designee's phone number 212 812-7000 | Personal identification number (PIN) |
|---|---|---|---|
| Yes ☑ No ☐ | Email: JOHN.OHANNESSIAN@MAZARSUSA.COM | | |

| **Paid preparers must complete (see instructions)** | Date: | **Sign here** |
|---|---|---|
| Preparer's signature JOHN OHANNESSIAN | Preparer's NYTPRIN | Signature of general partner |
| Firm's name *(or yours, if self-employed)* MAZARS USA LLP | Preparer's PTIN or SSN P00785762 | |
| Address 135 WEST 50TH STREET | Employer identification number 131459550 | |
| NEW YORK NY 10020 0002 | NYTPRIN excl. code 3 | Date | Daytime phone number |
| Email: JOHN.OHANNESSIAN@MAZARSUSA.C Phone number 2128127000 | | Email: |

Mail your return to: **STATE PROCESSING CENTER, PO BOX 15198, ALBANY NY 12212-5198.**

**This is a representation of the data on the e-filed return**

651119

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**2019**

For calendar year 2019, or tax year

beginning _____ ending _____

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

**Partner's Share of Income, Deductions, Credits, etc.**

▶ See separate instructions.

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| | |
|---|---|
| **1** Ordinary business income (loss) 0. | **15** Credits |
| **2** Net rental real estate income (loss) | |
| | **16** Foreign transactions |
| **3** Other net rental income (loss) | |
| **4a** Guaranteed payments for services | |
| **4b** Guaranteed payments for capital | |
| **4c** Total guaranteed payments | **17** Alternative min tax (AMT) items |
| **5** Interest income | |
| **6a** Ordinary dividends | |
| | **18** Tax-exempt income and nondeductible expenses |
| **6b** Qualified dividends | |
| **6c** Dividend equivalents | |
| **7** Royalties | **19** Distributions |
| **8** Net short-term capital gain (loss) | |
| | **20** Other information |
| **9a** Net long-term capital gain (loss) | |
| **9b** Collectibles (28%) gain (loss) | |
| **9c** Unrecaptured section 1250 gain | |
| **10** Net section 1231 gain (loss) | |
| **11** Other income (loss) | |
| **12** Section 179 deduction | |
| **13** Other deductions | |
| **14** Self-employment earnings (loss) A 0. | |
| | **21** ☐ More than one activity for at-risk purposes* |
| | **22** ☐ More than one activity for passive activity purposes* |
| | *See attached statement for additional information. |

### Part I   Information About the Partnership

**A** Partnership's employer identification number
46-4004440

**B** Partnership's name, address, city, state, and ZIP code

CSC 4540 LLC
757 3RD AVENUE, 17TH FLOOR
NEW YORK, NY   10017

**C** IRS Center where partnership filed return ▶
E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See inst.)
80-0742906

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

VERNON 4540 REALTY LLC
45 CARLEON AVE.
LARCHMONT, NY   10538

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?   PARTNERSHIP

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ☐

**J** Partner's share of profit, loss, and capital:

| | Beginning | Ending |
|---|---|---|
| Profit | 0.0000000 % | 0.0000000 % |
| Loss | 0.0000000 % | 0.0000000 % |
| Capital | 15.5275351 % | 0.0000000 % |

Check if decrease is due to sale or exchange of partnership interest ☐

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 0. | $ 0. |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 0. | $ 0. |

☐ Check this box if Item K includes liability amounts from lower tier partnerships.

**L**   **Partner's Capital Account Analysis**
SEE STATEMENT

| | |
|---|---|
| Beginning capital account | $ 5,550,000. |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ 0. |
| Other increase (decrease) (attach explanation) | $ |
| Withdrawals & distributions | $( ) |
| Ending capital account | $ 5,550,000. |

**M** Did the partner contribute property with a built-in gain or loss?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N**   **Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)**
Beginning _____ $ _____
Ending _____ $ _____

For IRS Use Only

911261 12-30-19   LHA   For Paperwork Reduction Act Notice, see Instructions for Form 1065.   www.irs.gov/Form1065   Schedule K-1 (Form 1065) 2019

2